**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Burnham MAPP, Defendant-Appellant.**

**No. 76–2196.**

United States Court of Appeals, Seventh Circuit.

Argued April 28, 1977.

Decided Aug. 25, 1977.

---

Thomas W. St. John, Milwaukee, Wis., for defendant-appellant.

William J. Mulligan, U. S. Atty., Thomas E. Brown, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS, TONE and BAUER, Circuit Judges.

BAUER, Circuit Judge.

Defendant Mapp appeals from his conviction for tax evasion in violation of 26 U.S.C. § 7201. The sole issue before us is whether evidence obtained as a result of Internal Revenue Service interrogations of the defendant and his wife should have been suppressed by the trial court. We affirm the trial court's refusal to suppress the evidence.

I.

After observing on several occasions a customized Cadillac automobile in the downtown Milwaukee area, a special agent of the Internal Revenue Service's Intelligence Division ran a routine check on the car and found that it was registered to the defendant. The special agent then obtained the Mapps' joint income tax returns for the calendar years 1969 and 1970. After examining the returns, the special agent filed a report, commonly referred to as an "information item," with a recommendation that the IRS Intelligence Division conduct a criminal investigation of the taxpayers.

On October 27, 1971, the Intelligence Division decided not to proceed with the matter and referred the case to the civil Audit Division. On January 31, 1972, a revenue agent who had reviewed the information item commenced an audit of the taxpayers. He interviewed the defendant and/or his wife on February 2, April 26, May 4, and May 8, 1972, at the defendant's tavern.

On September 11, 1972, Special Agent Collins, an agent of the Intelligence Division involved in an IRS project to obtain criminal tax prosecutions of drug dealers, was told by Milwaukee police officers that Mapp sold heroin from his tavern. Collins wrote this information in a report which he filed with the Information Gathering Retrieval Unit ("IGRU"), a computerized information bank available to all divisions of the Internal Revenue Service.

On September 21, 1972, a Milwaukee Vice Squad Officer offered Collins the additional information that a police informant was buying heroin from Mapp to support his $75 to $100 a day habit. Collins placed this information in another report which was filed with the IGRU.

On September 27, 1972, Collins learned that the civil Audit Division was investigating Mapp's 1969 and 1970 returns. The following day, Collins received a copy of Mapp's 1971 income tax return which he had previously requested. After examining the return, he turned it over to the Audit Division.

On September 29, 1972, Mapp's audit file was transferred to Audit Group 1208, whose sole function is to examine returns of taxpayers believed to have income from illegal sources. Audit Group 1208 requested this transfer on the strength of Collins's report of September 21, 1972.

Between October 20 and November 27, 1972, the defendant and/or his wife were interviewed on four occasions by revenue agents assigned to Audit Group 1208. On each occasion the interview occurred at defendant's tavern. At no time during the course of these interviews were the Mapps given Miranda warnings. During that time the file in the Audit Division contained the memoranda which Special Agent Collins had transmitted to IGRU, the original information item of the Intelligence Division Special Agent, and a newspaper clipping concerning the defendant's son's arrest during a drug raid. As a result of these interviews, information was developed which tended to establish that the Mapps had understated their income for 1969, 1970 and 1971.

On November 29, 1972, Mapp's file was forwarded to the Intelligence Division for criminal investigation. Interviews with the Mapps were conducted in the Federal Building by agents of the Intelligence Division on July 19 and September 25, 1973. At the first interview, the Mapps were advised of their constitutional rights as set forth in *United States v. Oliver*, 505 F.2d 301, 303 n. 5 (7th Cir. 1974). At the second interview, they were given the same advice and told that they could have an attorney present if they desired.

Both the defendant and his wife were indicted for income tax evasion on June 7, 1974. After pleading not guilty, they filed a motion to suppress all evidence that was derived from or produced as a result of the leads from the interrogations subsequent to September 29, 1972, the date their case was transferred to Audit Group 1208.

After conducting a hearing, the district court granted the motion to suppress on February 4, 1976. On the strength of *United States v. Dickerson*, 413 F.2d 1111 (7th Cir. 1969), and *United States v. Oliver*, 505 F.2d 301 (7th Cir. 1974), the court found that *Miranda* warnings should have been given to the defendants at all interrogations conducted after September 19, 1972 because at that time the investigative machinery of the Government was directed toward indicting and convicting the Mapps of criminal tax fraud.

While the Government's appeal was pending, the Supreme Court effectively overruled *Dickerson* in *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Thereafter, pursuant to a stipulation of the parties, we vacated the district court's suppression order and remanded the case for further proceedings in light of *Beckwith*.

After receiving supplemental briefs, Judge Reynolds issued a decision reversing his previous suppression order. The case then went to trial, at which Mr. Mapp was found guilty of evading income tax for the year 1969. The indictment was subsequently dismissed with respect to Mrs. Mapp.

On appeal, Mapp raises three arguments for suppression that he raised below: (1) that this case is not controlled by *Beckwith*; (2) that the defendants' admissions were involuntary, regardless of whether warnings were required; and (3) that suppression is warranted because IRS agents failed to follow their own rules.

## II.

In *Beckwith*, the Supreme Court held that an IRS special agent investigating potential criminal income tax violations need not give *Miranda* warnings before interrogating a taxpayer on whom the investigation has focused when the taxpayer is not "in the custodial situation described by the *Miranda* Court as the basis for its holding." 425 U.S. at 347, 96 S.Ct. at 1616. In its opinion, the Court quoted language from *Miranda* describing a "custodial situation" as

> "questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*, quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (emphasis supplied by Court).

Mapp contends that he should have been given warnings before he was interrogated by agents of Audit Group 1208 because the agents had "deprived him of his freedom of action in a significant way" by deceiving him as to the purpose of their investigation. The alleged deception occurred when Mapp suggested to an Audit Group 1208 agent questioning him that the IRS might be investigating him because of allegations of drug dealing. The agent replied that the IRS was not accusing him of selling drugs, but was examining his books and records.

Mapp argues that the agent psychologically coerced him into giving information by so answering his question, and thus that he was "deprived of his freedom of action in a significant way."

■ We do not believe that coercion of the type alleged here is what the *Beckwith*

Court had in mind when it spoke of the circumstances in which *Miranda* warnings are required. In both *Beckwith* and *Miranda*, the Court emphasized that warnings are required only when an interrogation is conducted in inherently coercive surroundings. 425 U.S. at 345–57, 96 S.Ct. 1612; 384 U.S. at 439, 445, 458, 86 S.Ct. 1602. Whether warnings are required depends upon whether the interrogation is of a custodial nature, not upon the substance of the interrogation itself. The substance of the interrogation, however, bears on the independent issue of the voluntariness of the statements made. See *Beckwith v. United States, supra* at 347–48, 96 S.Ct. 1612.

■ The interrogations at issue here were conducted at Mapp's tavern. Mapp was in familiar surroundings and under no physical compulsion of any kind. He was free to leave at any time. Such circumstances are by no means equivalent to a custodial situation. Therefore, *Miranda* warnings were not required.

## III.

■ Mapp next argues that the statements he made to the Audit Group 1208 agent in the November 27, 1972 interview, in which the agent told Mapp that he was not accusing him of dealing in drugs, were not voluntarily given and thus should have been suppressed.

The *Beckwith* Court recognized the availability of such a challenge to statements given to an IRS agent:

> "We recognize, of course, that non-custodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined . . . .' When such a claim is raised, it is the duty of an appellate court, including this Court, 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" 425 U.S. at 347–48, 96 S.Ct. at 1617 (citations omitted).

Mapp argues that the statements he made to the IRS agent on November 27, 1972 were not freely given because (1) the IRS intentionally failed to formally transfer this case to the criminal Intelligence Division in order to avoid having to give him *Miranda* warnings; (2) Mapp was a poorly educated man; (3) the IRS agent interrogating Mapp misled him as to the purpose of the interrogation by telling Mapp that he was not being accused of dealing in drugs; and (4) no *Miranda* warnings were given.

Reviewing these allegations in the context of the totality of circumstances surrounding the interrogation in question, we cannot accept Mapp's claim that his statements were involuntarily given.

As to the first allegation, there is no support in the record for Mapp's claim that the IRS intentionally deferred transferring his case to the Intelligence Division to avoid having to give him *Miranda* warnings. Moreover, even if this allegation were true, it could have no more effect on determining the voluntariness of Mapp's statements than Mapp's claim that warnings were not given.

On the other hand, a misrepresentation made to a taxpayer as to the nature of an investigation can be strong evidence of coercion. See *United States v. Lehman*, 468 F.2d 93, 105 (7th Cir.), *cert. denied*, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972); *United States v. Dickerson, supra* at 1116. Mapp alleges that this occurred here when the IRS agent told Mapp that he was not being accused of illegal drug dealing.

The difficulty with Mapp's argument is that the agent's response was not a misrepresentation. As the agent told Mapp, the IRS was interrogating Mapp with regard to possible income tax violations, not with regard to possible narcotics violations. Being truthful, the statement cannot be regarded as evidence of coercion.

We consider the other factors Mapp cites, his limited education and the failure to give *Miranda* warnings, to be inconsequential absent independent evidence of coercion and thus hold that Mapp's statements were voluntarily given.

## IV.

■ Defendant's final argument is that all the statements he made to Audit Group 1208 agents should be suppressed because the agents conducting the investigation failed to follow IRS rules. We need not consider whether suppression is proper in such an instance because we find that no rules were violated.

Mapp first contends that the Audit Group 1208 agents failed to advise him of his rights in accordance with IRS press releases that required special agents of the IRS Intelligence Division conducting criminal non-custody investigations to identify themselves to taxpayers, describe their function, and give taxpayers *Miranda* warnings. IRS News Release IR–949 (November 26, 1968), [1968] 7 Stand.Fed.Tax Rep. (CCH) ¶ 6946; IRS News Release IR–897 (October 3, 1967), [1967] 8 Stand.Fed.Tax Rep. (CCH) ¶ 5709.-1148. Mapp contends that the Audit Group 1208 agents should have complied with this rule, despite their not being special agents, because they were performing the function of special agents once the case was assigned to Group 1208. In effect, he argues that Audit Group 1208, despite being in the civil Audit Division of the IRS, was performing a criminal tax investigation that normally would have been conducted by the Intelligence Division. We find this attempt to circumvent the inapplicability of the rule to Group 1208 agents unconvincing. The agents who interrogated Mapp were not special agents and thus were not covered by the rule. They probably were not even aware of its existence. Perhaps the IRS should have transferred the case to the Intelligence Division or required the Audit Group 1208 agents to give warnings. But the IRS's failure to do these things does not speak to whether the rule was complied with in this instance. We cannot say the rule was not followed by the agents here. *United States v. Leonard*, 524 F.2d 1076, 1088–90 (2d Cir. 1975); *United States v. McCorkle*, 511 F.2d 482, 487–89 (7th Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 43, 46

L.Ed.2d 43 (1975); *United States v. Robson*, 477 F.2d 13, 16–17 (9th Cir. 1973), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975).

■ Mapp also contends that the agents handling his case violated two rules contained in the Internal Revenue Service "Audit Technique Handbook for Internal Revenue Agents." In the first place, we agree with the Tenth Circuit that these rules were adopted for the internal administration of the service and not for the protection of the taxpayer, and they therefore conferred no rights on the taxpayer. *United States v. Lockyer*, 448 F.2d 417, 420–21 (10th Cir. 1971). We also conclude that in any event the rules were not violated.

Mapp contends that, according to IRS rules, his case should have been transferred to the Intelligence Division rather than to Audit Group 1208. The rule allegedly violated provides:

"If during the course of an examination, a revenue agent discovers indications of fraud, he shall suspend his activities at the earliest opportunity without disclosing to the taxpayer, his representative or employees, the reason for such suspension. He will then prepare a report of his findings in writing . . . . The purpose of this referral report is to enable the Intelligence Division to evaluate the criminal potential of the case and decide whether a joint investigation should be initiated. It is important, therefore, that the referral report contain sufficient information to enable the chief, Intelligence Division, to make a proper evaluation." Internal Revenue Service, "Audit Technique Handbook for Internal Revenue Agents" § 10(91)(1).

Mapp argues that his case should have been transferred to the intelligence Division at least as early as September 29, 1972, the date it was referred to the special audit group, because the IRS was aware then of allegations that Mapp had sold drugs and that he had not listed income from drug sales on his tax return.

This rule is elaborated upon later in the same IRS publication:

"After an agent discovers the possible existence of fraud he must decide when to suspend his examination and prepare his referral report. As indicated above 'at the earliest opportunity' does not mean immediately. It means at the earliest point after discovering firm indication of fraud. This means the agent has taken steps to perfect this indication of fraud and developed them to a degree necessary to form the basis for a sound referral." Internal Revenue Service, "Audit Technique Handbook for Internal Revenue Agents" § 19(91)(2).

Thus, while a revenue agent might know of fraud, he must still, in his discretion, decide when the investigation has progressed to the point at which he has enough information so that the Intelligence Division can make an informed decision on whether or not to undertake a criminal investigation. In the instant case, the revenue agent from the special group who conducted the Mapp investigation testified at the suppression hearing that when he began his investigation he knew of the allegation of drug dealing, but had no knowledge that Mapp had understated his income on his tax returns.

After reviewing the sources and application of Mapp's funds for the years under investigation, the agent reached the conclusion that Mapp had understated his income on his tax returns. At that time he transferred Mapp's case to the Intelligence Division. To have referred this case to the Intelligence Division at an earlier date on the basis of unfounded allegations of drug sales in conjunction with the absence of reported income from such sales would not have provided the Intelligence Division a meaningful basis upon which to decide whether to launch a criminal investigation. Thus, the agent's delay in transferring the case was fully warranted and was in compliance with the IRS rule.

Finally, Mapp contends that the following rule was violated:

"It is important that potential criminal cases be handled properly by the agent.

The agent should not discuss the taxpayer's case with Intelligence prior to submission of the referral report. After the referral report is submitted, there should be no further contact with the taxpayer until the referral is either accepted (in which case a special agent should be present) or declined . . . ." Internal Revenue Service, "Audit Technique Handbook for Internal Revenue Agents" § 10(91)(5).

During the course of his investigation the special audit group agent who handled Mapp's case read the communications that had been fed into the IGRU by the special agent who had received the police tips regarding Mapp's drug dealing. Mapp contends that this contact between the revenue agent and the special agent constituted a discussion of Mapp's case in violation of this rule.

Since the record does not indicate that there was any *discussion* between the two agents, we do not think this rule was violated. The passing of information from the Intelligence Division to the Audit Group on a case that has been transferred from the former division to the latter seems entirely proper. It was possible, if not probable, that the case might never have been transferred back to the Intelligence Division.* Given this possibility, it would constitute an unreasonable segregation of functions for the Intelligence Division to withhold information relevant to the Audit Division's cases.

On the basis of the foregoing, the appellant's conviction is

AFFIRMED.

---

* An Audit Group 1208 agent testified at the suppression hearing that no more than fifty percent of the Audit Group 1208 cases are referred to the Intelligence Division, and that the most likely number of cases transferred is ten percent.