UNITED STATES of America, Plaintiff-Appellee,

v.

Burton KAATZ, Donald Kaatz and Morton Kaatz, Defendants-Appellants.

Nos. 81–1935, 81–1936 and 81–1941.

United States Court of Appeals, Tenth Circuit.

Jan. 20, 1983.

Richard P. Slivka of Bosworth & Slivka, P.C., Denver, Colo., for defendants-appellants Donald Kaatz and Burton Kaatz.

Michael J. Abramovitz of Drexler, Wald & Abramovitz, P.C., Denver, Colo. (Tim Correll, Denver, Colo., with him on the briefs), for defendant-appellant Morton Kaatz.

Robert T. McAllister, Asst. U.S. Atty., Denver, Colo. (Robert N. Miller, U.S. Atty., Denver, Colo., with him on the brief), for plaintiff-appellee.

Before SETH, SEYMOUR and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

A 12-count information charged the three defendants-appellants with submission of false income tax returns and evasion of income tax in violation of 26 U.S.C. §§ 7206 and 7201. The jury found each guilty under each count in which he was named as a defendant. The separate appeals were consolidated for hearing and disposition in this court. We affirm.

The defendants Donald Kaatz, Morton Kaatz, and Burton Kaatz are brothers who were engaged in various family businesses in Denver, Colorado. Three companies are involved: Denver Hardware Company (Hardware), a corporation in the wholesale hardware business; Denver Screen Company (Screen), a Subchapter S corporation for income tax purposes, which is engaged in the manufacture and sale of screens, doors, windows, related supplies, and materials; and Denver Key and Lock Company (Key), a corporation engaged in a retail locksmith business. Additionally, the three brothers held equal interests in a partnership, Kabro Investments.

The three Kaatz brothers were the shareholders and officers of the three corpora-

tions, Hardware, Screen, and Key. Hardware and Screen shared the same location. Key was separately located. The bookkeeping for all three enterprises was done by Hardware. Gilbert Hirsh was the accountant for the brothers and their enterprises. He prepared the questioned income tax returns from records furnished to him. Banking for all concerned was at the American National Bank of Denver (Bank). The Internal Revenue Service, IRS, investigation which culminated in prosecution of the brothers was instigated by a Currency Transaction Report, CTR, by Bank to IRS showing the purchase of a $100,000 certificate of deposit by Morton Kaatz in which $96,000 of currency in small bills was used. The 1973 federal income tax return of Morton was assigned to IRS agent Dunbar for civil audit. The audit was expanded to include Donald, Burton, and Hardware. Dunbar found firm indications of fraud and referred the matter to the IRS Intelligence Division. The pending criminal charges followed.

The government presented a "specific items" case based on the understatement of receipts by Hardware and the diversion of such receipts to the brothers. The unreported items came from two sources: first, cash receipts from over-the-counter sales which were not shown on the company books; second, payments, by Key to Hardware for materials furnished, not shown on the books. Cash derived from the two sources was diverted either to the brothers or to their partnership, Kabro.

On the over-the-counter sales, the government produced ten customers who made purchases from Hardware and paid by check or currency. The checks were endorsed by Hardware. Berland, the credit manager at Hardware, testified that the cash sales were noted on a small invoice. The credit sales were noted on a large invoice. The credit sales were recorded and shown on bank deposit slips. The checks or cash received at the time of sale were totalled on adding machine tape and presented to the Bank in return for cash. Christenson, a Hardware bookkeeper, testified that Morton would pick up the small invoic-

es which were never returned to Hardware nor recorded on the books.

Vahling, the manager of Key, testified that Key purchased various items from Hardware and paid at month's end by checks signed by him. Pertinent checks, variously endorsed, will be discussed later.

The government summary, Ex. No. 2338, prepared by witness Butterfield, showed the following unreported Hardware sales:

| | Fiscal 1973 | Fiscal 1974 | Fiscal 1975 |
|---|---|---|---|
| Over-the-Counter Sales | $22,157.88 | $12,527.95 | $ 9,806.49 |
| Sales-Key and Lock | 59,596.44 | 57,536.19 | 12,810.93 |
| Total Unreported Sales | 81,754.32 | 70,064.14 | 22,617.42 |

Three bank tellers testified that, on an almost daily basis, one of the brothers would produce at a bank drive-up window two sets of checks, one of which was deposited to the Hardware account. The other, accompanied by the adding machine tape, would be paid by currency, usually $100 bills, in amounts varying from $400 to $2,500. Fallon, another Bank employee, testified that during the 1972–1974 period, certificates of deposit totalling $500,000 were purchased at the Bank in the names of Kabro, Morton Kaatz, and Ida Mae Kaatz.

Agent Dunbar interviewed each brother and their accountant Hirsh. He also examined the books and records furnished to him. Defense complaints about Dunbar's activities will be discussed later.

IRS agent Burich testified that he examined all the books and records of Hardware for the pertinent years and could not find a single instance where an over-the-counter sale paid in cash or check was recorded or deposited. He obtained micro-film copies of many checks cashed but not deposited. Requests were made to customers for original invoices and checks relating to over-the-counter sales. Customer responses filled 14 volumes. Burich could find no record on the books of payments by Key to Hardware.

IRS agent Butterfield presented summary exhibits of the government evidence. These summaries, Ex. Nos. 2340, 2341 and 2342, showed the following taxes due from each defendant for the year noted:

|              | 1972        | 1973        | 1974       |
|--------------|-------------|-------------|------------|
| Donald Kaatz | $11,516.46  | $11,491.32  | $ 7,183.43 |
| Morton Kaatz | 24,515.63   | 19,635.01   | 12,526.59  |
| Burton Kaatz | 10,351.48   | 11,616.17   | 3,355.43   |

Defense witnesses testified that the brothers often used cash in running their businesses but none identified the amount of cash so used. Accountant Hirsh testified that, in preparing the income tax returns, he used the books and records furnished to him. He was unaware of the dual invoices used on over-the-counter sales and of the payments by Key to Hardware for materials purchased. Defense witness Stone, qualified as an expert, testified as to accounting theories pertaining to gross receipts and trade discounts, and admitted that he had not examined any of the relevant books and records. None of the defendants testified.

We first consider defense claims of the erroneous receipt of evidence. The defendants moved to suppress evidence obtained by IRS agent Dunbar "and the fruits of any such evidence." The defense grounds for the motion were based on (1) the use of a Currency Transaction Report, CTR, and (2) the use of evidence obtained by Dunbar during civil audit of records of the brothers and their enterprises. The court held a lengthy hearing and denied the motion.

*The Currency Transaction Report.*

The brothers banked at the American National Bank of Denver. On July 17, 1973, the operations officer of the Bank executed a CTR on IRS Form 4789 in which he reported that on July 17, Morton Kaatz purchased a $100,000 certificate of deposit and used in the transaction $96,000 in currency none of which was in a denomination of $100 or higher. The CTR was received by the IRS at its Philadelphia Service Center on July 23, 1973, and sent by it to the Intelligence Division at Denver where it was received on September 14, 1973. In 1975 Dunbar was assigned to audit the tax returns of Morton Kaatz. The CTR was in the file which he received. The defense claims that the use of the CTR must be suppressed.

The dispute centers around the Bank Secrecy Act of 1970 and the implementing regulations of the Secretary of the Treasury. In declaring the purpose of the Act, Congress said, 31 U.S.C. § 1051:

"It is the purpose of this chapter to require certain reports or records where such reports or records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings."

Subchapter II of the Act covers Domestic Currency Transactions. Section 1081, 31 U.S.C., directs domestic financial institutions to report transactions involving transfer of United States currency as required by the Secretary. Section 1082 provides that transaction reports "shall be signed or otherwise made both by the domestic financial institution involved and by one or more of the other parties thereto or participants therein, *as the Secretary may require.*" [Emphasis supplied.]

The CTR was signed only by a bank officer. Defendants argue that the use of the CTR violated the Act because it was not signed by Morton Kaatz, the purchaser of the certificate of deposit.

Section 1053 says that the Secretary "shall prescribe such regulations as he may deem appropriate to carry out the purposes of this chapter." Section 1055 provides that the Secretary "may make such exemptions from any requirement otherwise imposed under this chapter as he may deem appropriate." Among the regulations promulgated by the Secretary is 31 C.F.R. § 103.22 which reads:

"Each financial institution shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000. Such reports shall be made on forms prescribed by the Secretary and all information called for in the forms shall be furnished."

Defendants argue that the regulation does not comply with the Act because only the Bank is required to execute the CTR. We do not agree. The Secretary was em-

powered to prescribe regulations and grant exemptions. The requirement of execution only by the Bank and the elimination of the necessity for signature of the party making the transaction was reasonable and a proper exemption. Otherwise a serious question would arise with regard to the participant's Fifth Amendment privilege against self-incrimination. See *Marchetti v. United States,* 390 U.S. 39, 48–61, 88 S.Ct. 697, 702–09, 19 L.Ed.2d 889.

In *Stark v. Connally,* N.D.Cal., 347 F.Supp. 1242, a three-judge court in 1972 held unconstitutional the reporting provisions of the Act relating to domestic financial transactions and enjoined the Secretary from enforcing them. Id. at 1251. Notice was given to the banks that submission of the reports would not be compelled. R. vol. VIII, pp. 33–37 and Govt. Ex. Nos. 1 and 4. The submission of the CTR by the American National Bank was a voluntary act on its part. In receiving and using the voluntary submission in 1973, the IRS did not violate the then pending injunction. The 1974 decision of the Supreme Court in *California Bankers Association v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812, reversed the district court and upheld the domestic reporting provisions of the Act.

Morton Kaatz, who purchased the certificate of deposit from the Bank with $96,000 in currency, argues that the execution, receipt, and use of the CTR violated his rights under the Fourth and Fifth Amendments. With regard to the Fourth Amendment, he claims that the CTR violated his right to privacy in the conduct of his financial affairs.

Morton voluntarily carried out the banking transaction for the purchase of the certificate of deposit with a large amount of currency. Acting in the usual course of its business, the Bank recorded the transaction. He says that the regulation, § 103.22, is constitutionally defective because it does not require the Bank to notify him of the CTR. In *California Bankers Association,* supra, 416 U.S. at 70, 94 S.Ct. at 1521–22, the Court said:

"The fact that the regulations do not require the banks to notify the customer of the report violates no Constitutional right of the banks, and the *banks in any event are left free to adopt whatever customer notification procedures they desire."* [Emphasis supplied.]

■ The failure of the Bank to notify Morton of the CTR violates none of his constitutional rights. We have here no search or seizure in violation of the Fourth Amendment. The Bank reported a transaction to which it and Morton were the only parties. Morton had no legitimate "expectation of privacy" concerning information contained in Bank records, *United States v. Miller,* 425 U.S. 435, 442, 96 S.Ct. 1619, 1623, 48 L.Ed.2d 71, and no Fourth Amendment protected interest in the Bank records. Id. at 443, 96 S.Ct. at 1624 and cases there cited.

■ The Fifth Amendment argument is without merit. Morton acted under no compulsion in his transaction with the Bank. He was not forced to buy the certificate of deposit or to use currency in so doing. *Fisher v. United States,* 425 U.S. 391, 397, 96 S.Ct. 1569, 1574, 48 L.Ed.2d 39, says:

"The Court has held repeatedly that the Fifth Amendment is limited to prohibiting the use of 'physical or moral compulsion' exerted on the person asserting the privilege . . . ." (Citations omitted.)

In the instant case no compulsion was exercised on the defendant and no right of privacy existed within the protection of the Fifth Amendment. Id. at 398–399, 96 S.Ct. at 1574–75.

*Use of the Civil Audit.*

■ Defendants contend that evidence obtained by IRS agent Dunbar during a civil audit should have been suppressed. Dunbar was routinely assigned in 1975 to the civil audit of Morton's 1973 return and was furnished a copy of that return and of the CTR. On a number of occasions beginning in August, 1975, Dunbar interviewed the accountant Hirsh, and the three Kaatz brothers. He also examined the books of

the family enterprises. At the outset of the first interview Dunbar told Morton and Hirsh that he was examining Morton's 1973 tax return. At the same interview Morton told Dunbar that he did not deal in cash and did not keep large sums of money on hand. R. vol. XIII, pp. 194, 228–229. On November 4, 1975, Dunbar met with Hirsh and told him that he was concerned with large amounts of cash shown in the Kabro records and reflected in the CTR. R. vol. XIII, pp. 229–231. On November 14, Dunbar told Donald and Burton that they were under audit examination. R. vol. IV, p. 142. The audit was expanded to include the companies and the Kabro partnership. Dunbar testified that he did not refer the case to the Intelligence Division at that time because he believed that there were a number of unanswered questions regarding the operations of the family enterprises. R. vol. IV, pp. 147–148. Dunbar conducted an extensive examination of the books, records, and documents. On the basis of his studies he concluded that there were firm indications of fraud and referred cases on each of the brothers and on Hardware to the Intelligence Division. At no time before or during his audit did Dunbar discuss the matter with the Intelligence Division. R. vol. III, pp. 52–53, 96. At his first meeting with Morton and accountant Hirsh, Dunbar identified himself as an IRS agent conducting a civil audit of Morton's 1973 return. He was not required to do anything more. See *United States v. Robson,* 9 Cir., 477 F.2d 13, 16, cert. denied, 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398, and *United States v. McCorkle,* 7 Cir., 511 F.2d 482, 489, cert. denied, 423 U.S. 826, 96 S.Ct. 43, 46 L.Ed.2d 43. Dunbar made a routine tax investigation openly commenced and devoid of stealth or deceit. See *United States v. Sclafani,* 2 Cir., 265 F.2d 408, 414–415, cert. denied, 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534.'

Nothing in the Record shows that the defendants were misled by anything Dunbar did or said. Failure to warn that a criminal investigation may ensue is not fraud, deceit, or trickery. *United States v. Pruddin,* 5 Cir., 424 F.2d 1021, 1033, cert.

denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62.

Defendants claim that Dunbar did not comply with the "Audit Technique Handbook for Internal Revenue Agents." *United States v. Lockyer,* 10 Cir., 448 F.2d 417, 420–421, holds that the Handbook prescribes the duties of the agent prior to referral to the Intelligence Division and does not define the rights of the taxpayer. Violation of the Handbook rules does not prove a violation of any constitutional right. See *United States v. Caceres,* 440 U.S. 741, 744–745, 99 S.Ct. 1465, 1467–68, 59 L.Ed.2d 733.

Handbook ¶ (10)91(1) provides that if in the course of an investigation the agent discovers indications of fraud, he shall suspend his activities "at the earliest opportunity," and report his finding to the Intelligence Division. "Earliest opportunity" means "at the earliest point after discovering *firm* evidence of fraud. This means more than suspicion." [Emphasis in original.] See ¶ (10)91(2). As a practical matter, Dunbar was presented with the claim of Morton that, with the family corporations, it made no difference into which pocket the money went or out of which pocket it came. Dunbar's actions show compliance with the Handbook and careful regard for the defendants' rights. Nothing in the Record shows fraud or deceit on the part of the government. The motion to suppress was properly denied.

### Statements of Morton Kaatz to Agent Dunbar

Donald and Burton Kaatz contend that testimony of agent Dunbar concerning statements made to him by Morton Kaatz and implicating both Donald and Burton was received in violation of the holding in *Bruton v. United States,* 391 U.S. 123, 126–137, 88 S.Ct. 1620, 1622–28, 20 L.Ed.2d 476, that extrajudicial statements of one defendant may not be received against a co-defendant in a joint trial because admission of the statement violates the Confrontation Clause of the Sixth Amendment.

Morton had his own lawyer. Donald and Burton were represented by another lawyer. No defendant moved for a severance. R. vol. XIV, p. 293. The Record shows that the three brothers desired a joint trial. The government admittedly informed defense counsel, before trial, of the statements by Morton to the agent implicating both Donald and Burton.

In a question-and-answer offer of proof out of the presence of the jury, Dunbar testified that Morton said that he cashed some of the Key checks and "would divide it into thirds and give each of the other two brothers one-third of the proceeds." R. vol. XIII, p. 211. The court ruled that until evidence of a joint venture was established the portion of the statement relating to the brothers should be excluded. Before the jury, and without any objection, Dunbar testified that Morton stated that some of the checks were deposited in a partnership account and some cashed by him. R. vol. XIII, p. 232.

Cross-examination of Dunbar by Morton's attorney elicited the following testimony which was received without objection by anyone, R. vol. XIII, p. 242:

> "He [Morton] further went on to explain that the other partners in this partnership account were his two brothers, who were also shareholders in Denver Hardware; and that the checks were split equally three ways and deposited in this partnership account as a contribution of capital.
>
>   \*  \*  \*  \*  \*  \*
>
> He also said that on the ones that he cashed and received cash for at the bank he would, again, split it up equally three ways and give each of the other two brothers their equal share."

No motion was made to strike this testimony. After Dunbar was excused and after another witness had testified, counsel for Donald and Burton moved for a mistrial because of the receipt of Morton's statements to the agent. The court denied the motion.

Donald and Burton had notice through pre-trial disclosures by the government and through the detailed offer of proof that Morton's statement to Dunbar included references to them. They did not object when Morton's counsel brought out the complete statement which implicated them. Their trial tactics were consistent with the defense that the evidence showed a family operation with no intent to violate the tax laws. Donald and Burton are in no position to assert now any objections to the receipt of Morton's statement to Dunbar.

Defendants argue that incriminating evidence was received before a conspiracy was established. Several decisions note the difficulty confronting the government with regard to the order of proof in joint trials. See e.g. *United States v. Krohn,* 10 Cir., 573 F.2d 1382, 1386–1387, cert. denied, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792; *United States v. Andrews,* 10 Cir., 585 F.2d 961, 966; *United States v. Petersen,* 10 Cir., 611 F.2d 1313, 1327–1329, cert. denied, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854.

█ The contention that some of the evidence received was impermissible hearsay is not persuasive. Rule 801(d)(2), F.R. Evid., notes exceptions to the hearsay rule. The Record shows that the brothers were engaged in a joint enterprise whereby they combined and acted in unison to divert receipts of Hardware into their own pockets and thereby evaded federal income taxes. This is enough to invoke Rule 801(d)(2). The failure to charge conspiracy in the information does not defeat the Rule. See *United States v. Durland,* 10 Cir., 575 F.2d 1306, 1310. At the conclusion of the government case, the court correctly held that independent evidence established that the defendants were engaged in a joint venture. The order of proof is within the discretion of the trial judge. That discretion was not abused. In a complex case such as this, the failure to make the finding until the close of the government case does not justify reversal.

*The Certificates of Deposit*

█ Government evidence showed the purchase of the following certificates of deposit:

One by Morton Kaatz for $100,000;

Two by Ida Mae Kaatz for $100,000 each;

Two by Kabro for $100,000 each.

Ida Mae Kaatz is the wife of Morton Kaatz. The two filed a joint return for each of the years in question. The defense argues that the admission of the certificates violates the safeguards established by *Holland v. United States,* 348 U.S. 121, 125–129, 75 S.Ct. 127, 130–32, 99 L.Ed. 150. Holland was a net worth case in which a starting figure must be established in order to show an increase in net worth during the pertinent tax period. We are here concerned with a specific items case which requires proof of unreported income. The theory of the defense was that business proceeds were all used in the family enterprises without intent to evade income taxes. To show intent and willfulness the government introduced the questioned evidence indicating a personal, rather than business, use of substantial amounts. As we have noted, substantial independent evidence established the joint venture in which the brothers were engaged. The evidence was admissible.

*Sufficiency of the Evidence*

■ Each defendant says that the evidence is insufficient to sustain his conviction of the counts in which he is named as a defendant. We do not weigh the evidence or determine the credibility of witnesses. "The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680; see also *United States v. Samara,* 10 Cir., 643 F.2d 701, 704, cert. denied, 454 U.S. 829, 102 S.Ct. 122, 70 L.Ed.2d 104. ·

■ The defendants attack the summaries prepared by agent Butterfield and received in evidence. Butterfield was a qualified expert who testified and presented charts summarizing the 2,300 exhibits of the government. The use of summaries is proper. Rule 1006, F.R.Evid.; see also *United States v. Cooper,* 10 Cir., 464 F.2d 648, 656, cert. denied, 409 U.S. 1107, 93 S.Ct. 901, 34 L.Ed.2d 688. The underlying materials were basically business records of Hardware and Key properly admitted in evidence pursuant to Rule 803(6), F.R.Evid., pertaining to records of regularly conducted activity. See also 28 U.S.C. § 1732. "Business records prepared in the regular course of business are admissible in evidence." *United States v. Hines,* 10 Cir., 564 F.2d 925, 928, cert. denied, 434 U.S. 1022, 98 S.Ct. 748, 54 L.Ed.2d 770. The trial court did not abuse its wide discretion in receiving the business records. See *United States v. Jones,* 5 Cir., 554 F.2d 251, 252, cert. denied, 434 U.S. 866, 98 S.Ct. 202, 54 L.Ed.2d 142. Summaries may properly be put before a jury with limiting instructions. *United States v. Scales,* 6 Cir., 594 F.2d 558, 563, cert. denied, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049. See also Rule 1008, F.R.Evid. Here such instructions were given. See R. vol. XV, p. 419.

Defendants object to government Ex. 2339, Butterfield's summary of unreported payments by Key to Hardware. Vahling, the manager of Key, testified that Key frequently purchased materials and supplies from Hardware. R. vol. XIII, p. 153. At the end of each month Vahling would write a check to Hardware for the goods purchased. R. vol. XIII, p. 155. Key would take a deduction on its income tax return for the cost of purchase from Hardware. R. vol. XIII, p. 191. The checks were endorsed in various ways, including Hardware, R. vol. XIII, p. 169, Kabro, R. vol. XIII, p. 169, Morton Kaatz, R. vol. XIII, p. 176, Burton Kaatz, R. vol. XIII, p. 177, and the account number of Donald Kaatz, R. vol. XIII, p. 178. Morton told Dunbar that he split the Key checks three ways with his brothers. R. vol. XIII, p. 242, and Deft's Ex. E.

Government Ex. 2339, a summary of checks from Key to Hardware, shows one Key check endorsed by Burton and one endorsed by Donald. They claim that the only proof of their endorsements is impermissible hearsay. Ex. 2339 includes in its check list the following:

| Date | Check Number | Amount of Check | Endorser |
|---|---|---|---|
| 4/26/74 | 1938 | $ 4,412.27 | Morton Kaatz |
| 4/26/74 | 1939 | 4,412.27 | Burton Kaatz |
| 4/26/74 | 1940 | 4,412.27 | Donald Kaatz |

Check No. 1938 is government Ex. 2319 A & B; check No. 1939 is Ex. 2320 A & B; and check No. 1940 is Ex. 2321 A & B. No question is raised as to the endorsement of check No. 1938 by Morton. With regard to check No. 1939, agent Butterfield testified that it was endorsed by Burton. R. vol. XV, p. 433. The argument is that the government did not prove that Butterfield knew Burton's signature. If the jury had doubt as to authenticity, it could have compared the endorsement with the signature of Burton on his income tax returns, Ex. Nos. 2291, 2292, and 2293. As to check No. 1940, the reverse side bears the endorsement of Hardware and below that a number which Butterfield testified was "Donald Kaatz' account number at the American National Bank." R. vol. XV, p. 434. All three checks were properly received in evidence and as exhibits spoke for themselves.

■ Willfulness is an essential ingredient of both § 7201 and § 7206(1), Title 26 U.S.C., violations of which are charged by the information. Defendants insist that the government did not prove that they acted willfully. Willfulness may be inferred from "concealment of assets or covering up sources of information, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or conceal." *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418. The Record shows that the defendants understated the receipts of Hardware by omission of the over-the-counter sales and of the payments by Key to Hardware. Such receipts were diverted to the individual defendants or to Kabro, their partnership. They handled their affairs so as to avoid making the records usual to the businesses which they operated, and they did not disclose to their accountant the receipts which they diverted. Substantial evidence establishes the noted facts, and sustains a reasonable inference of willfulness. See

*United States v. Samara,* supra, 643 F.2d at 704. The Record supports the jury verdict finding each defendant guilty of each count in which he was named.

*Instructions*

The objections to the instructions affect only Counts I, II, and III of the information which charged Donald and Morton Kaatz with making false income tax returns for Hardware which understated Hardware's gross receipts. The court rejected as argumentative a requested instruction purporting to define gross receipts to exclude certain inter-company transactions.

Our concern is only with the denial of the requested instruction. The transcript does not contain the instructions as actually given and our review is confined to a typewritten set of instructions which counsel certify as correct. If there was any compliance, or attempted compliance, with the provisions of Rule 30, F.R.Crim.P., relating to objections to the instructions, we are unable to find it in the Record. Suffice it to say that the certified instructions are complete, adequate, fair, and an accurate statement of the applicable law.

■ The court correctly instructed that the government did not have to prove the exact amounts charged in the information. It is enough that the government prove substantial unreported income. See *United States v. Samara,* supra, 643 F.2d at 703. The instructions given fairly set forth the theories of the defense. See R. vol. II, pp. 214–215. The instructions must be reviewed as a whole. *United States v. Westbo,* 10 Cir., 576 F.2d 285, 289. The requested instruction would have added nothing but confusion and was properly refused.

The judgments are severally affirmed.