**Martin G. GRODER, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 86–2054.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 13, 1986.

Decided April 9, 1987.

Carolyn Johnson Woodruff (James N. Duggins, Jr., J. Reed Johnston, Jr., Tuggle, Duggins, Meschan & Elrod, P.A., Greensboro, N.C., on brief), for appellant.

Steven W. Parks (Roger M. Olsen, Asst. Atty. Gen., Michael L. Paup, William A. Whitledge, Washington, D.C., Kenneth W. McAllister, U.S. Atty., Greensboro, N.C., on brief), for appellee.

Before WIDENER and WILKINSON, Circuit Judges, and MAXWELL, Chief United States District Judge for the Northern District of West Virginia, sitting by designation.

WILKINSON, Circuit Judge:

Martin Groder appeals the district court's denial of his motion to quash certain Internal Revenue Service (IRS) summonses requiring the production of records held by several savings institutions. He asserts that the district court erred in not holding that the IRS violated appellant's due process rights by failing to follow its own administrative procedures governing referral of a taxpayer's case for fraud investigation. Appellant further contends the summonses were issued in bad faith and therefore constitute an abuse of judicial process.

We affirm.

## I.

In June of 1984, Revenue Agent Lena Dunston notified appellant Groder that she would audit his 1982 individual income tax return. In late August, 1984, Groder filed amended joint income tax returns with the IRS Memphis Service Center for 1978 through 1982. The amended joint returns showed substantial additions to income. For example, Dr. Groder's amended return showed a large increase to his Schedule C, Profit or Loss From Business or Profession. The original tax return for 1982 showed a net profit of $61,610.12, while the amended return showed a net profit of $135,807.09. Groder also attempted to file an amended joint return for 1982 with IRS Collection Officer Jack McCaslin. Apparently, Groder was having marital difficulties, and he sought to have any additional taxes assessed and collected from joint property before a divorce action was instituted. Collection Officer McCaslin, however, could not process the joint return because it was not signed by appellant's

wife. He agreed to process appellant's liability separately.

Immediately after appellant filed the amended returns, Groder's attorney, Carolyn Woodruff, met with Revenue Agent Dunston and gave her copies of Groder's amended returns for 1981 and 1982. At their first meeting, Woodruff explained that Groder's marital difficulties made it impossible to gain access to his financial records. In addition, Woodruff provided Dunston with bank statements for at least four of appellant's bank accounts, the account numbers of his four checking accounts, the location of his all-savers certificates and safety deposit boxes, and his 1982 cash receipts journal. Dunston discussed the amended returns with her Group Manager, Bill Dowd. She had not yet considered the possibility that appellant's original 1981 and 1982 tax returns might be fraudulent.

At the time of the Groder audit, Dunston had been with the IRS for less than a year. In September, 1984, shortly after receiving Groder's amended returns, Dunston attended a Continuing Professional Education training class on tax fraud where she studied Internal Revenue Manual section 4565.-21. I CCH IRM (Audit) para. 981. Section 4565.21 requires revenue agents to suspend their civil audits when they discover a "firm indication of fraud" and to refer such cases to the Criminal Investigation Division of the IRS for assignment to a special agent trained to investigate tax fraud. After attending the class, Dunston discussed Groder's amended returns with her Group Manager.

On September 7, 1984, Dunston and Woodruff met again. Woodruff told Dunston that Groder had also filed amended returns for 1978, 1979 and 1980. Dunston discussed the case with Gail Patterson, her On-the-Job Supervisor. Subsequently, Dunston gave Woodruff a set of questions that she wanted to ask Groder. On October 17, 1984, Dunston again met with Woodruff. Woodruff relayed to Dunston the answers she obtained from Groder. Appellant alleges that Dunston informed Woodruff at that time that she was considering a recommendation to settle the matter with the imposition of a negligence penalty. Dunston then met with Patterson and Dowd to discuss the Groder case again. They instructed her to make her own decision as to how to proceed.

On November 14, 1984, at another meeting, Dunston represented to Woodruff that she could not "close the audit" without personally interviewing Groder. At the interview, which took place on January 28, 1985, Dunston asked Groder to explain why he filed the amended tax returns. He responded that his marital difficulties prevented him from obtaining the financial records that he needed to file accurate tax returns. Dunston found the explanation unpersuasive, and on January 29, 1985, she prepared a civil fraud referral.

Dunston's recommendation for a civil fraud investigation was examined by the Criminal Investigation Division which decided to conduct an investigation for criminal fraud. The criminal fraud investigation was assigned to Special Agent Walter E. Gupton on March 12, 1985. Six months later, Special Agent Gupton issued summonses to various savings institutions, requiring the production, among other things, of the Groder family's cancelled checks, deposit tickets for their checking and savings accounts, financial statements, records of entry for a safety deposit box, and monthly statements of account for their credit card.

Groder moved to quash the IRS summonses. He contended in essence that the government's course of conduct amounted to a violation of his Fifth Amendment right to due process. According to Groder, his attorney was "mousetrapped" into providing information during the course of Dunston's investigation that might not have been provided if he had been aware that a criminal inquiry might be forthcoming. Groder contended that the IRS acted in bad faith by improperly delaying referral and by failing to follow its own internal procedures with respect to the decision. He contended that, for these reasons, enforcement of the IRS summonses should be denied.

The district court enforced the summonses. It found that the IRS did not act in bad faith in determining when to refer Groder's case for criminal investigation. Taxpayer thereupon brought this timely appeal.

## II.

Taxpayer alleges in this case that the IRS violated section 4565.21 of the Internal Revenue Manual. That section requires revenue agents to suspend their civil audits when they discover "a firm indication of fraud" and to refer such cases to the Criminal Investigation Division. The Supreme Court addressed the legal effect of IRS Manual provisions in *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). There, the Court distinguished internal rules of agency procedure from regulations promulgated pursuant to statutory directive for a taxpayer's benefit. Section 4565.21 is in the former category. It confers no substantive rights or privileges upon taxpayers. Several circuit courts have squarely so held. *See, e.g., United States v. Mapp*, 561 F.2d 685, 690 (7th Cir.1977); *United States v. Lockyer*, 448 F.2d 417, 421 (10th Cir.1971); *United States v. Kaatz*, 705 F.2d 1237, 1243 (10th Cir.1983); *United States v. Arthur Andersen & Co.*, 43 A.F.T.R.2d 79–1161, 79–1162 (2d Cir.1979).

The language of the Audit Guidelines for Examiners reinforces this conclusion. The purpose of the fraud provisions "is to provide information and guidelines to aid the examiner in understanding what fraud is and to recognize the indications of fraud." I CCH Internal Revenue Manual (Audit) para. 911(3). The effect of the provisions is to regulate the flow of business between different units of the IRS and not to provide a legal cause of action or means of redress for individual taxpayers. There are many such rules and procedures in government which agencies must remain free to adopt without fear of creating a litigable point on the part of every person with whom the agency comes in contact. "In the long run, it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration ... than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form." *United States v. Caceres*, 440 U.S. at 756, 99 S.Ct. at 1474.

The violation of a guideline such as this one is thus, by itself, without legal effect to quash a summons or to suppress evidence at a criminal trial. In order to prevail, a taxpayer must show more than a mere violation of the Internal Revenue Manual. He must show that the government proceeded against him in bad faith. *United States v. Powell*, 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964); *see also Donaldson v. United States*, 400 U.S. 517, 536, 91 S.Ct. 534, 545, 27 L.Ed.2d 580 (1971); *United States v. LaSalle National Bank*, 437 U.S. 298, 313–14, 98 S.Ct. 2357, 2365–66, 57 L.Ed.2d 221 (1978). A Manual violation may be relevant to this showing, but it is not conclusive. The evidentiary weight to be assigned such factors lies within the sound discretion of the district courts.

## III.

Taxpayer makes no contention that the summonses here were issued for an improper purpose, to obtain irrelevant or unnecessary information, or that issuance of the summonses somehow violated the process prescribed in the Internal Revenue Code. *United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964). Instead, he contends that referral of his case to a special agent was improperly delayed and that he continued to provide testimony and financial records to the IRS in a civil auditing procedure long after a "firm indication of fraud" was evident. He further contends that any information learned by the government after the appropriate date of referral cannot provide the basis of a summons of taxpayer's financial records. For the reasons that follow, we believe taxpayer's contentions must fail.

We emphasize at the outset that the individual revenue agent and his supervisors enjoy latitude in making the difficult

referral decision. They also deserve deference from a reviewing court. Federal judges, after all, are not revenue agents. The administration of the revenue laws is a function which by congressional direction and by expertise belongs to IRS. *Liberty Financial Services v. U.S.*, 778 F.2d 1390, 1392 (9th Cir.1985); *U.S. v. G & G Advertising Co.*, 762 F.2d 632, 635 (8th Cir.1985). Determining the presence of tax fraud can be an intricate process. "Second-guessing a Revenue Agent's judgment should not become a routine chore for judges...." *United States v. Matis*, 476 F.Supp. 1287, 1292–93 (S.D.N.Y.1979).

The Audit Guidelines for Examiners indicate the referral decision is inescapably a discretionary one. *See United States v. Mapp*, 561 F.2d 685, 690 (7th Cir.1977). The Guidelines advise that "how far to extend the examination will depend on the examiner's judgment in a particular case." I CCH IRM (Audit) para. 961. "There can be no absolute criterion established upon which to rely in making a decision when to suspend an investigation and refer a case to Criminal Investigation." *Id.* at para. 982(6). According to the Manual, "[t]he facts and circumstances in any particular case must be considered" by the revenue agent in applying the guidelines. *Id.* at para. 982(7), 922(2). Those facts and circumstances include the credibility of the individual taxpayer and, as such, will vary with the individual case.

Appellant argues nonetheless that this court should hold as a matter of law that Revenue Agent Dunston had "a firm indication of fraud" after her first meeting with appellant's counsel. According to appellant, fraud was indicated by the fact that 1) his income was substantially understated; 2) appellant's counsel failed to offer an explanation for the amended tax returns; and 3) Agent Dunston failed to refer the matter after discussing it with her superiors.

█ Appellant's position would not only tend to transform the judgmental nature of the referral decision into one with general, *a priori* rules and conditions; it also overlooks the plain wording of section 4565.21.

That section instructs agents to suspend their investigations when they detect a "firm indication of fraud" and to refer such cases for evaluation by the Criminal Investigation Division. A "firm indication" is something different from a "first" indication or a mere suspicion that intentional fraud exists. If a firm indication is taken to mean the same thing as a mere suspicion, taxpayers would be subject to fraud investigations as a matter of course, and "the revenue agent would have to cease almost before he started his investigation." *United States v. Lockyer*, 448 F.2d 417, 421 (10th Cir.1971). *See also United States v. Kaatz*, 705 F.2d 1237, 1243 (10th Cir.1983).

Taxpayer would find a "firm indication of fraud" primarily in the understatement of income on the original returns. Again, if his position were to prevail, it might deter the filing of amended returns by taxpayers who simply wished to rectify an honest mistake. Many innocent explanations exist for unreported income. For example, the Guidelines state that a failure to report income correctly "may be due to mistake, inadvertence, reliance on professional advice, honest difference of opinion, negligence or carelessness, none of which constitutes deliberate intent to defraud." I CCH IRM (Audit) para. 933(1).

The Guidelines thus require the revenue agent to verify an understatement and to discover whether the taxpayer deliberately understated his income. I CCH IRM (Audit) para. 930. They instruct the revenue agent to gather facts and to seek explanations which might account for the discrepancy. *Id.* at para. 981(2). They stress the importance of developing the case in sufficient detail so that the Criminal Investigation Division can determine whether a criminal investigation is warranted.

Revenue Agent Dunston testified that she did not have "a firm indication of fraud" until she personally talked to appellant. Although Groder's attorney told Dunston that his marital difficulties prevented him from obtaining access to his financial records, the attorney's explanation was vague as to when and how Dr.

Groder's access to his records was cut off. While the record also suggests that Dunston believed that she was required to personally interview Groder before she could wind up her auditing duties, her purpose during the interview was to determine whether or not this taxpayer had a reasonable explanation for underreporting his income. At Dunston's interview with Groder, he explained why his marital difficulties posed an obstacle to filing accurate returns even before he moved out of the house. While some explanations might have proved sufficient, Dunston determined that Groder's was not, and she referred the matter to the Criminal Investigation Division the day after the interview.

■ The stated reason for the delayed referral in this case was thus a permissible one, if made in good faith. The IRS might properly detect fraud in a substantial understatement of income and a taxpayer's inability, through counsel, to explain it. We decline to say, however, that an agent automatically violates the Audit Guidelines by seeking an explanation from taxpayer himself. *See United States v. Morgan*, 761 F.2d 1009, 1010 (4th Cir.1985) (revenue agent continued his investigation for five months, referring only after asking taxpayer and his attorney for an explanation); *United States v. Kaatz*, 705 F.2d 1237 (10th Cir.1983) (revenue agent interviewed taxpayers and their accountant on a number of occasions before referral). Any other approach would encourage premature referrals of taxpayers for fraud investigations based on little more than a revenue agent's unsubstantiated hunch.

## IV.

Even if we assume that a violation of the IRS Manual occurred in this case, the district court found that taxpayer failed to prove that the government proceeded against him in bad faith. We decline to disturb that finding.

■ The abuse of judicial process that would lead courts to deny enforcement of a summons has been tied to a showing of governmental bad faith.* *United States v. Powell*, 379 U.S. at 58, 85 S.Ct. at 255. The burden to prove bad faith rests with the taxpayer. The IRS's violation of its own regulations "is not proof by itself of bad faith in a tax investigation." *United States v. Equitable Trust Co.*, 611 F.2d 492, 500 (4th Cir.1979). Nor is "failure to warn that a criminal investigation may ensue." *United States v. Kaatz*, 705 F.2d 1237, 1243 (10th Cir.1983). Bad faith involves fraud or deceit on the part of the government. *Id.; see also U.S. v. Tweel*, 550 F.2d 297 (5th Cir.1977). In this situation, bad faith would arise if a revenue agent misrepresented to taxpayer the possibility of referral in order to elicit information for use in a fraud investigation. For the agent to obtain information in such a manner would destroy whatever reservoir of trust remains in citizen taxpayers and discourage the cooperation that might resolve matters in a prompt and satisfactory way.

The district court addressed this critical issue. It found that Revenue Agent Dunston was inexperienced and "that a more

---

* Prior to 1982, the IRS was empowered by section 7602 of the Internal Revenue Code, 26 U.S.C. § 7602, to issue summonses only in conducting civil tax investigations. In 1982, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub.L. No. 97–248, 96 Stat. 324 (1982), which made clear that the IRS could properly issue summonses for criminal as well as civil tax investigations. A taxpayer, however, can prevent enforcement by showing that the IRS's purpose in issuing the summons was solely to harass him, to force him to settle a collateral dispute, or to gather information for other departments such as the Department of Justice, or, alternatively, that the summons was issued after the matter had already been referred to the Justice Department for criminal prosecution. *Pickel v. United States*, 746 F.2d 176 (3d Cir.1984).

In this case, the taxpayer does not challenge the IRS's use of the summonsing power to obtain information in a criminal investigation. He contends instead that the information which formed the basis for the summonses was obtained through false pretenses and that the revenue agent "tricked" him into surrendering it. The TEFRA amendments do not compel us to hold that, until the case is referred for criminal prosecution, revenue agents may use any means, however improper, to delude taxpayers into handing over their financial records during a civil tax audit.

experienced agent would have discontinued the investigation at an earlier stage." It also found that there was "no evidence of bad faith or intent to deceive on the part of the agent or her supervisors."

■ Neither finding is clearly erroneous. There was testimony that the agent may have inadvisedly discussed penalties before she had sufficient information to determine whether fraud was in this case. The unreported income here was substantial. In addition, taxpayer seemed prompted to amend his returns after the onset of the civil audit. Assessment of the facts by a more seasoned agent may well have led to an earlier referral than occurred here.

Inexperience, however, is different from bad faith. The district court found that nothing about the decision reflected any impropriety on the part of the Service. The court listened extensively to the testimony of Agent Dunston, among others, and found that testimony credible, including her statement that she had no intention of trying to obtain evidence against taxpayer for use in a subsequent criminal prosecution, and that taxpayer's understatement of income, while unusual, did not firmly impress her as fraudulent until she talked to Dr. Groder.

Honest differences of opinion over the timing of referral simply cannot afford the basis for judicial intervention into the normal tax enforcement procedures of the Service. If that were so, the timing of every referral would become a matter of potential litigation and federal judges would be tempted to supplant the hard judgment calls of revenue agents in the field with their own notions of how tax laws should be enforced. We cannot encourage such a portentious shift in governmental responsibilities.

■ The same concern leads us to reject taxpayer's attempt to introduce a "reasonable agent" standard into referral questions. Such a standard would mire courts in an inquiry on the "reasonableness" or "objective good faith" of every referral decision. Congress intended these to be summary proceedings, *United States v. Arthur Young & Co.*, 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984), and taxpayer's standard would transform their character.

We therefore affirm the judgment of the district court and direct enforcement of the summonses.

AFFIRMED.

