# IN THE SUPREME COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      §
DEPARTMENT OF FINANCE,    §    No. 303, 2020
     §
     Plaintiff Below,      §
     Appellant,      §    Court Below: Court of Chancery
     §    of the State of Delaware
     v.      §
     §    C.A. No. 2019-0985
AT&T INC.,      §
     §
     Defendant Below,    §
     Appellee.      §

Submitted: March 17, 2021
Decided:    June 1, 2021

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery: **AFFIRMED AND REMANDED**.

Melanie K. Sharp, Esquire, Martin S. Lessner, Esquire (*argued*), Mary F. Dugan, Esquire, and Michael A. Laukaitis II, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Attorneys for Plaintiff-Appellant State of Delaware, Department of Finance*.

Brian M. Rostocki, Esquire and Benjamin P. Chapple, Esquire, REED SMITH LLP, Wilmington, Delaware; Sara A. Lima, Esquire (*argued*), REED SMITH LLP, Philadelphia, Pennsylvania; *Attorneys for Defendant-Appellee, AT&T Inc*.

**SEITZ**, Chief Justice:

The Delaware Department of Finance served an administrative subpoena on AT&T Inc. to produce records relating to a financial audit. AT&T refused to produce all of the requested records. The Department responded by filing a complaint in the Court of Chancery to enforce the subpoena. AT&T defended by claiming, among other things, that the subpoena exceeded the Department's authority and was overbroad. The Court of Chancery held that, although the Department validly issued the subpoena, AT&T "met its burden to show that the scope of the subpoena is so expansive that enforcement would constitute an abuse" of the court's process.[1] The court noted that it had offered the Department the opportunity to supplement the record to explain why the subpoena should be enforced as written, but the Department declined the invitation. And, according to the court, it could have modified the subpoena, or permitted the Department to serve a narrower subpoena, but the Department declined these alternatives. The court therefore quashed the subpoena in its entirety. The Department has appealed the court's decision.

For the reasons explained below, we affirm the Court of Chancery's judgment. We recognize, however, as the Court of Chancery did, that the procedural and substantive aspects of administrative subpoena enforcement are issues of first impression in Delaware. We adopt the procedures and substance followed by the

---

[1] *State of Del., Dep't of Fin. v. AT&T Inc.*, 239 A.3d 541, 547 (Del. Ch. 2020).

federal courts in administrative subpoena enforcement proceedings. When the Department files a complaint to enforce an administrative subpoena, it must support the complaint with an affidavit or verification that shows it has a legitimate purpose for its investigation, the information sought may be relevant to the purpose and is not already in the Department's possession, and the Department has complied with any administrative requirements. The respondent then files a response, where it can contest the Department's assertions. If the respondent goes a step further and claims that the subpoena has been issued for an improper purpose such that enforcement would be an abuse of the court's process, then the burden is on the respondent to make a particularized showing in its response that the Department issued the subpoena in bad faith, such as for harassment or to pressure the respondent to settle a collateral dispute. After the respondent files a response, and the parties make any further submissions called for by the court, the Court of Chancery should then convene a prompt hearing and address in summary fashion the enforcement issues. An evidentiary hearing should take place only in those cases when the court, after according great deference to the Department's administrative judgments, believes that the disputed issues can only be resolved after hearing from witnesses.

Because we have announced new procedural and substantive standards governing administrative subpoenas, we will allow the Department to serve a new subpoena on AT&T that complies with the guidance in this opinion. If the dispute

3

cannot be resolved, the Department should file an amended complaint to enforce the new subpoena, which should be addressed by the Court of Chancery consistent with the procedures and substantive review announced in this opinion.

## I.

Delaware's unclaimed property law, also known as escheat, allows the State to claim abandoned property if, after the statutory dormancy period, no rightful owner appears (the "Escheat Law" or "Escheat Statute").[2] Unclaimed property laws are rooted in the principle that abandoned property should be collected by the State to benefit the citizenry rather than confer a potential windfall on the holder.[3]

---

[2] 12 *Del. C.* §§ 1130-1190. Escheat means the State assumes title to or custody of unclaimed property. Note, *Origins and Development of Modern Escheat*, 61 COLUM. L. REV. 1319 (1961). Escheat originated in the English feudal system where all land was considered derived from the Crown. *Id.* at 1320. If a tenant died without heirs, "the land escheated, or fell back[,]" and reverted up the feudal chain of possession. *Id.* Similarly, the common law concept of *bona vacantia* gave the Crown the power to claim title to abandoned personal property. *Id.* at 1326 (noting that *bona vacantia* differs from escheat in that *bona vacantia* "was predicated on the absence of any other owner rather than on [the Crown's] status as ultimate owner"). In the United States, escheat and *bona vacantia* merged under the umbrella of escheat. *See Delaware v. New York*, 507 U.S. 490, 497 n.9 (1993) (explaining that the contemporary concept of escheat bears a closer resemblance to *bona vacantia* and encompasses both real and personal property). States, as sovereigns, may escheat real or personal property located in that state after the owner has "abandoned" the property as defined under the State's escheat statute. *Texas v. New Jersey*, 379 U.S. 674, 677 (1965), *supplemented by*, 380 U.S. 518 (1965). Modern escheat statutes also cover abandoned or unclaimed intangible personal property such as corporate dividends, bank accounts, and insurance policies. *See, e.g.*, 12 *Del. C.* § 1130(18) (defining "property" as both tangible and intangible under Delaware's escheat laws).

[3] The State may use the funds obtained through the unclaimed property statute in its operating budget until the property is claimed. *See State of Del., Dep't of Fin. v. Univar, Inc.*, 2020 WL 2569703, at *1 (Del. Ch. May 21, 2020).

4

Under Delaware's Escheat Law, there is an Escheator of the State, who is the Secretary of Finance or the Secretary's delegate.[4] The State Escheator can, subject to limitations, "contract with a person to conduct compliance reviews and examinations" of the State's unclaimed property laws.[5] It can examine records, take testimony, and issue subpoenas to assess compliance with the State's unclaimed property laws.[6] Specific to subpoenas, the statute provides that the State Escheator or its agent can:

> (3) Issue an administrative subpoena to require that [] records . . . be made available for examination and that [] testimony . . . be provided.

> (4) Bring an action in the Court of Chancery seeking enforcement of an administrative subpoena issued under paragraph (3) of this section, which the Court shall consider under procedures that will lead to an expeditious resolution of the action.[7]

---

[4] 12 *Del. C.* § 1102.

[5] *Id.* at § 1178.

[6] *Id.* at § 1171. The State Escheator can also coordinate an audit with other states to verify compliance with the State's Escheat Law. *Id.* at § 1181. If the State Escheator works with other states, it can only exchange information or examine records "if the other state has confidentiality and security requirements substantially equivalent to those in the [Delaware Escheat Statute] or agrees in a record to be bound by this State's confidentiality and security requirements." *Id.* at § 1181(b). The State Escheator can also "retain a private attorney in this State or another state or foreign country to commence an action to recover property on behalf of the State Escheator and may agree to pay attorneys' fees based in whole or in part on a fixed fee, hourly fee, or a percentage of the amount or value of property recovered in the action." *Id.* at § 1182(e). The Escheat Statute also has general confidentiality requirements that must be followed when conducting an audit. *Id.* at § 1189.

[7] *Id.* at § 1171. The Court of Chancery plays a role beyond hearing requests to enforce administrative subpoenas. In an appellate capacity, the court adjudicates underreporting disputes between the State Escheator and respondents over escheated property (12 *Del. C.* § 1179) and can "enforce the determination and secure payment or delivery of past due, unpaid, or undelivered property." *Id.* at §§ 1179-80.

A.

On January 12, 2012, the Department sent AT&T—a Delaware corporation—a notice of unclaimed property examination.[8] The Department designated third-party auditor Kelmar Associates LLC ("Kelmar") as its agent for the examination. Over the next several years, Kelmar requested from AT&T documents related to the audit. AT&T apparently satisfied all the requests except the two that are the subject of this appeal. The parties refer to these requests as the "Rebates Request" and the "Disbursements Request." On October 30, 2014, Kelmar sent the Rebates Request. It asked AT&T to identify and provide transaction details for all general ledger accounts used to track customer rebate accrual and expense activity during a particular period.[9] The Rebates Request also asked AT&T to name all third-party administrators it had used to issue rebates and the duration of the vendors' relationships with AT&T.[10]

On January 17, 2018, Kelmar notified AT&T of the Disbursements Request. The Disbursements Request sought information on all checks issued from twenty-seven accounts since June 1992.[11] Kelmar asked AT&T to identify which business unit each check was issued on behalf of, the general ledger account where it was

---

[8] Since 1999, AT&T filed consolidated unclaimed property reports on behalf of itself and its affiliates with the State Escheator. App. to Opening Br. at A0103; 12 *Del. C.* § 1142(a).
[9] App. to Opening Br. at A0154-56.
[10] *Id.* at A0156.
[11] *Id.* at A0144-47.

recorded, the payee's name and address, and whether the check was cashed, voided, stopped, still outstanding, or voided and reissued.[12] Seven months later, Kelmar notified AT&T of an additional bank account it had added to the Disbursement Request.[13]

While the examination of AT&T's records was ongoing, the General Assembly amended Delaware's unclaimed property laws (the "2017 Amendments").[14] Three aspects of the 2017 Amendments are relevant to this appeal. First, the amendments authorized the State to issue administrative subpoenas to require production of records related to an unclaimed property examination.[15] Second, the amendments extended the statute of limitations for most unclaimed property audits from three years to ten years.[16] This decision will refer to the statute of limitations in place prior to the 2017 Amendments as the "Old Statute of Limitations" and the statute of limitations as amended in 2017 as the "New Statute of Limitations." Finally, under the 2017 Amendments, the subject of a pending examination may "notify the [Department] of the person's intent to expedite the completion of the pending examination . . . ."[17] Doing so requires the Department

---

[12] *Id.* at A0144-45.
[13] *Id.* at A0148-52.
[14] *See* 81 Del. Laws ch. 1 (2017).
[15] 12 *Del. C.* § 1171(3).
[16] 12 *Del. C.* §§ 1156(b), 1172(h).
[17] *Id.* at § 1172(c)(1).

7

to serve "[a]ll requests for records, testimony, and information" no more than eighteen months from the date the expedited examination request was submitted.[18]

AT&T was the subject of a pending examination when the General Assembly enacted the 2017 Amendments. Thus, AT&T was entitled to an expedited examination under the revised law. AT&T submitted the required notice to the Department on December 11, 2017. Two months later, AT&T and Kelmar finalized a work plan for the expedited examination.[19]

The parties disagree on what happened next. The Department argues that, after the parties executed the work plan, AT&T "refused to produce documents" relating to the Rebates and Disbursements Requests thereby "violating its own work plan with the State."[20] According to AT&T, "the records produced to date, which include[d] years of AT&T's unclaimed property reports to Delaware, [were] sufficient to proceed with its audit to determine AT&T's unclaimed property compliance."[21] Specifically, AT&T argues that it responded to the Disbursement Request with "payment data for every quarter-end month (four months per year) for approximately eight years[,]" which "amounted to over 10.5 million lines of information and reflected spend of over $16 billion."[22] AT&T further claims that it

---

[18] *Id.* at § 1172(c)(3).
[19] App. to Opening Br. at A0164-65.
[20] Opening Br. at 9.
[21] Answering Br. at 9.
[22] *Id.* (citing App. to Opening Br. at A0106-07).

"provided schedules of data and detailed in writing how it maintain[ed] information that may be responsive to the [Rebates] [R]equest."[23]

In response to AT&T's objections to the outstanding requests, the Department sent AT&T seven notices of deficiencies between July 2018 and October 2019. The Department cautioned that failure to comply with the work plan could result in termination of the expedited examination. On October 31, 2019, the Department terminated the expedited examination. The termination notice included a warning that the Department might issue an administrative subpoena for the records if AT&T did not produce the outstanding documents. AT&T did not respond. On November 8, 2019, the Department issued an administrative subpoena demanding the production of documents responsive to the Rebates Request and the Disbursement Request.

B.

On December 6, 2019, AT&T filed an action in the United States District Court for the District of Delaware against three Delaware Department of Finance officials challenging the constitutionality of the Delaware Escheat Law. This action followed four days later. In the district court case, AT&T moved to stay the Court of Chancery litigation pending resolution of the federal action, and also moved to

---

[23] *Id.* (citing App. to Opening Br. at A0107).

9

dismiss the case, or to quash or modify the subpoena. The district court stayed the federal case pending the outcome of the Court of Chancery action and this appeal.[24]

On July 10, 2020, the Court of Chancery quashed the subpoena in its entirety. First, the Court of Chancery denied AT&T's request to stay the action in favor of the federal action. It also denied AT&T's motion to dismiss for failure to join indispensable parties. Those issues have not been raised on appeal. Next, the court concluded that the Department was authorized to issue the subpoena, and the subpoena satisfied the framework for enforcing administrative subpoenas set forth in the United States Supreme Court's decision *United States v. Powell*.[25] But as the court interpreted *Powell*, the court should not enforce an "unreasonable" subpoena if it would be an abuse of the court's process.[26] The court ultimately held that AT&T had established that the subpoena was so "expansive, both as to the time period it cover[ed] and the subject matter it embrace[d][,]"[27] that "the Department issued an

[24] *AT&T Cap. Servs., Inc. et al. v. Geisenberger et al.*, C.A. No. 1:19-cv-02238-MN, D.I. 22 (filed July 28, 2020); *Geisenberger et al.*, D.I. 26 (filed Jan. 12, 2021).

[25] 379 U.S. 48, 57-58 (1964); *AT&T Inc.*, 239 A.3d at 547 ("This decision holds that the Escheat Law granted the State Escheator the authority to issue the subpoena, which the Department exercised.").

[26] *AT&T Inc.*, 239 A.3d at 547. The Court of Chancery observed that "[d]ecisions considering the enforcement of administrative subpoenas also evaluate the dimension of reasonableness." *Id.* at 562 (citing *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946)).

[27] *Id.* at 575. The court found that a combination of factors supported its abuse of the court's process conclusion: (1) the Department's failure to provide a rationale for records requests that covered periods "sixteen years beyond the point at which the Old Statute of Limitations would [have] prevent[ed] the State Escheator from recovering unclaimed property," (2) the Department's requests for records where the last-known address may have been outside Delaware, in potential violation of the statute, and (3) the Department's requests for records of all checks, regardless of the check's disposition. *Id.*

overly broad and unreasonable subpoena such that to enforce it would abuse the court's process."[28]

The Court of Chancery also found Kelmar's involvement in the investigation troublesome. Relying on federal cases that have questioned Kelmar's auditing practices in other states, the court noted that the breadth of the subpoena, coupled with the fact that Kelmar was compensated contingently and "works for other states in similar arrangements," suggested that Kelmar might be furthering its own interests to support its business in other states.[29] The court also found that "[t]he Department appear[ed] to have lent the State[]'s investigatory authority to Kelmar to use as it sees fit."[30] Thus, taken together, the court held that enforcing the subpoena would be an abuse of the court's process.

The Court of Chancery decided to quash, rather than modify, the subpoena. According to the court, quashing the subpoena was the only alternative because the parties did not provide the court with a sufficient basis to narrow the subpoena. The court rejected AT&T's proposed limitations after finding that it would confine the Department's authority beyond what is already permissible under the Escheat Statute. The court noted that it would have preferred to give "significant deference"

---

[28] *Id.* at 563.

[29] *Id.* at 576 (citing *Fidelity & Guar. Life Ins. Co. v. Frerichs*, 2017 WL 4863318, at *4 (C.D. Ill. Sept. 5, 2017); *Fidelity & Guar. Life Ins. Co. v. Chiang*, 2014 WL 6090559, at *1-2 (E.D. Cal. Nov. 13, 2014)).

[30] *Id.*

11

to the Department in narrowing the subpoena, but the Department declined to propose any modifications.[31]

The Department sought reargument on the grounds that the court "exceeded the appropriate scope of review for an abuse of the court's process, misapprehended the factual record relating to [Kelmar's] compensation, and incorrectly created a presumption that Kelmar . . . would improperly seek documents to use in examinations for other [s]tates."[32] The Court of Chancery denied the Department's motion for reargument and dismissed the case without giving the Department leave to amend its complaint.

C.

On appeal, the Department argues that the Court of Chancery erred in several respects. First, the Department contends that, once the court found that the Department met the elements of the *Powell* test, it should not have quashed the subpoena using the "abuse of the court's process" standard. In other words, the court should have presumed good faith on the Department's part and not jumped to the abuse of the court's process review. Second, the Department argues that the Court of Chancery should not have singled out Kelmar's involvement in the audit and its disputed contingency fee arrangement to find an abuse of the court's process. Even

---

[31] *Id.* at 577.
[32] Opening Br. at 1.

if the State compensated Kelmar by contingency, according to the Department, the contingency arrangement was unrelated to the validity of the subpoena. Third, the Department contends that the court erred in applying the Old Statute of Limitations to assess the reasonableness of the subpoena. As they argue, the New Statute of Limitations in the 2017 version of the unclaimed property law should have been applied retroactively. And even if the Old Statute of Limitations applied, the Department claims, the Department's information requests were not restricted to the statute of limitations period. Next, the Department argues that the Court of Chancery erred when it refused to accept the Department's representation that it had narrowed the temporal scope of the subpoena with AT&T. And finally, the Department argues the court erred by entering a final judgment after granting AT&T's motion to quash instead of allowing the Department to amend its complaint as a matter of right under Court of Chancery Rule 15(a).

AT&T responds that the Court of Chancery's factual findings—the overbreadth of the subpoena and Kelmar's financial incentives—could be considered by the court when deciding whether the court's process would be abused by enforcing the subpoena. What constitutes an abuse of the court's process, according to AT&T, is within the court's discretion. And regardless, AT&T argues, the court had the power to inquire further into the Department's information requests but could not because the Department refused to cooperate. AT&T further asserts

that the court correctly applied the Old Statute of Limitations. The court was required to presume that the New Statute of Limitations had prospective effect only, and finding to the contrary would impact AT&T's vested rights. And finally, AT&T argues that it had not agreed with the Department to narrow the subpoena and the court was not obligated to grant the Department's request for further proceedings when the Department could simply issue a new subpoena.

On appeal we defer to the Court of Chancery's factual findings and will not set aside those findings "unless they are clearly erroneous or not the product of a logical and orderly deductive reasoning process".[33] Questions of law are subject to *de novo* review.[34]

## II.

In *United States v. Morton Salt*,[35] the United States Supreme Court held that a government agency charged with examining suspected wrongdoing has "a power of inquisition" akin to that of a grand jury "which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."[36] An administrative subpoena is not an "actual search or seizure" subject to the Fourth

---

[33] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994).
[34] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1043 (Del. 2014).
[35] 338 U.S. 632 (1950).
[36] *Id.* at 643-44.

14

Amendment's probable cause requirement.[37]  Rather, "[t]he gist of the [Fourth Amendment] protection [against administrative subpoenas] is in the requirement . . . that the disclosure sought shall not be unreasonable."[38]  Agency investigatory powers are afforded great deference by the judiciary.[39]  When the legislature has given the agency the power to issue administrative subpoenas, judicial review of a complaint for enforcement is "strictly limited."[40]

In *Morton Salt* the Court held that a subpoena is enforceable if "the inquiry is within the authority of the agency, the demand is not too indefinite, and the

---

[37] *Powell*, 379 U.S. at 57; *see also Okla. Press*, 327 U.S. at 195, 216 (stating that investigative subpoenas need not be "limited . . . by forecasts of the probable result of the investigation") (internal quotation marks omitted) (quoting *Blair v. United States*, 250 U.S. 273, 282 (1919)).

[38] *Okla. Press*, 327 U.S. at 208.

[39] 338 U.S. at 642 ("Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry.").  Without deference to administrative agencies, "[j]udicial supervision of agency decisions to investigate might hopelessly entangle the courts in areas that would prove to be unmanageable and would certainly throw great amounts of sand into the gears of the administrative process." *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 127 n.12 (3d Cir. 1981) (internal quotation marks omitted) (quoting *Dresser Indus., Inc. v. United States*, 596 F.2d 1231, 1235 n.1 (5th Cir. 1979)).

[40] *FTC v. Texaco, Inc.*, 555 F.2d 862, 871-72 (D.C. Cir. 1977) (*en banc*).  The D.C. Circuit explained that "while the court's function is 'neither minor nor ministerial,' the scope of issues which may be litigated in an enforcement proceeding must be narrow, because of the important governmental interest in the expeditious investigation of possible unlawful activity." *Texaco, Inc.*, 555 F.2d at 872 (internal citation omitted) (quoting *Okla. Press*, 327 U.S. at 217 n.57); *accord Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 64 (3d Cir. 2003) ("[J]udicial review of administrative subpoenas is 'strictly limited.'") (quoting *Texaco, Inc.*, 555 F.2d at 871-72); *In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995) ("The courts' role in a proceeding to enforce an administrative subpoena is 'extremely limited.'") (quoting *NLRB v. C.C.C. Assoc., Inc.*, 306 F.2d 534, 538 (2d Cir. 1962)); *E.E.O.C. v. Kloster Cruise Ltd.*, 939 F.2d 920, 922 (11th Cir. 1991) ("It is well-settled that the role of a district court in a proceeding to enforce an administrative subpoena is sharply limited . . . .").

information sought is reasonably relevant" to the authorized inquiry.[41] An agency's "determination of relevance should be accepted if not 'obviously wrong.'"[42]

In *United States v. Powell*, the United States Supreme Court refined the inquiry when courts are asked to enforce administrative subpoenas. There, a corporate taxpayer refused to comply with an IRS administrative summons. The company's president argued that a three-year statute of limitations barred the IRS from seeking further assessments unless the agency could "indicate some grounds for its belief a fraud had been committed."[43] The district court granted the petition for enforcement. The Third Circuit reversed and found that the Internal Revenue Code barred the IRS from re-examining the taxpayer's records unless it could make a showing of probable cause.

The United States Supreme Court reversed the Third Circuit decision. The Court held that "the Commissioner need not meet any standard of probable cause to obtain enforcement of his summons, either before or after the three-year statute of limitations on ordinary tax liabilities has expired."[44] To hold otherwise "might seriously hamper the Commissioner in carrying out investigations he thinks

---

[41] *Morton Salt*, 338 U.S. at 652.
[42] *F.T.C. v. Carter*, 636 F.2d 781, 788 (D.C. Cir. 1980) (quoting *Texaco, Inc.*, 555 F.2d at 877 n.32).
[43] *Powell*, 379 U.S. at 49.
[44] *Id.* at 57.

warranted, forcing him to litigate and prosecute appeals on the very subject which he desires to investigate . . . ."[45]

Summarizing the appropriate standard of judicial review, the Supreme Court in *Powell* held that an administrative subpoena is enforceable when the agency shows that (1) the investigation will be conducted for a legitimate purpose, (2) the inquiry may be relevant to the purpose, (3) the information sought is not already within the agency's possession, and (4) the administrative steps required by the statute have been followed.[46] If the government has met this preliminary showing, the burden shifts to the subpoena recipient to disprove one of the *Powell* factors or to demonstrate that enforcement would constitute an "abuse of the court's process."[47]

After *Powell*, a subpoena issued within an agency's statutory authority is "presumed to be reasonable."[48] "[T]he burden of demonstrating that [the] subpoena

---

[45] *Id.* at 54.
[46] *Id.* at 57-58.
[47] *Id.* at 58 ("The burden of showing an abuse of the court's process is on the [party objecting to the subpoena] . . . ."); *see also United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978) ("[T]hose opposing enforcement of a summons do bear the burden to disprove the actual existence of a valid . . . purpose [for the investigation] by the [agency].").
[48] *U.S. v. R. Enters., Inc.*, 498 U.S. 292, 300-01 (1991) (explaining that "the law presumes . . . that a grand jury acts within the legitimate scope of its authority[,]" and therefore, "a grand jury subpoena issued through normal channels is presumed to be reasonable"). This principle applies with equal force to administrative subpoenas. *See Morton Salt*, 338 U.S. at 642-43 (analogizing the subpoena power to that of grand juries).

17

is unreasonable falls on the individual to whom it is directed."[49] When a subpoena is challenged as overbroad, its permissible scope is addressed by the second *Powell* factor. "[W]hether [the] evidence sought is relevant requires the [] court to evaluate the relationship between the particular materials sought and the particular matter under investigation—an analysis 'variable in relation to the nature, purposes and scope of the inquiry.'"[50] It must be "adequate, but not excessive, for the purposes of

---

[49] *In re McVane*, 44 F.3d at 1135 (citing *FTC v. Rockefeller*, 549 F.2d 182, 190 (2d Cir. 1979)); *Texaco, Inc.*, 555 F.2d at 882 ("The burden of showing that the request is unreasonable is on the subpoenaed party.") (citing *Powell*, 379 U.S. at 58; *FTC v. Standard Am., Inc.*, 306 F.2d 231, 235 (3d Cir. 1962)).

[50] *McLane Co., Inc. v. E.E.O.C.*, 137 S. Ct. 1159, 1167-68 (2017) (quoting *Okla. Press*, 327 U.S. at 209). Several Federal Courts of Appeals have applied this framework when reviewing subpoenas challenged as overbroad. *See Doe v. United States*, 253 F.3d 256, 266-71 (6th Cir. 2001) (considering the scope of the materials requested and whether production of those materials would be an undue burden on the subpoena recipient under "the second element of [the court's] test for determining the enforceability of an administrative subpoena [which] focuses on the relevance of the documents to the agency's investigation" ); *In re McVane*, 44 F.3d at 1135 (noting that "[t]he relevance of the sought-after information is measured against the general purposes of the agency's investigation, 'which necessarily presupposes an inquiry into the possible range of investigation under the statute'") (quoting *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1516 (D.C. Cir. 1993)); *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 169-71 (3d Cir. 1986) (evaluating a subpoena challenged as overly broad under a "relevancy standard"); *United States v. Goldman*, 637 F.2d 664, 666 (9th Cir. 1980) (affirming the district court's denial of enforcement after finding that "the government had not met its light burden in establishing that the records [from two years prior to the agent's examination] were relevant"); *United States v. Freedom Church*, 613 F.2d 316, 321-22 (1st Cir. 1979) (reviewing the summonee's challenge to the scope of the IRS summons in terms of its relevancy to the investigation); *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1031 (D.C. Cir. 1978) ("The breadth of an investigation is for the investigators to determine. The breadth of a subpoena or of a search made in records may be excessive, but the test is relevance to the specific purpose, and the purpose is determined by the investigators.") (quoting 1 Davis, Administrative Law Treatise § 3.06, at 188-89 (1958)).

the relevant inquiry." [51]    Ultimately, the question comes down to one of

reasonableness.[52]

Under *Powell*, the court can also consider whether enforcing the subpoena

would constitute an abuse of the court's process.  This factor is different than the

other *Powell* factors.  It addresses whether the court is being asked to join the agency

in an act of bad faith:

> It is the court's process which is invoked to enforce the administrative
> summons and a court may not permit its process to be abused.  Such an
> abuse would take place if the summons had been issued for an improper
> purpose, such as to harass the [target of the investigation] or to put
> pressure on him to settle a collateral dispute, or for any other purpose
> reflecting on the good faith of the particular investigation.[53]

If an agency satisfies the four *Powell* factors, however, it is strong evidence

of an administrative agency's good faith.[54]  The party opposing the subpoena then

---

[51] *See Okla. Press*, 327 U.S. at 208-09 (articulating this reasonableness standard, the United States Supreme Court stated that the subpoena must be "authorized by [the legislature]," "relevant to the inquiry[,]" and shall be "adequate, but not excessive, for the purposes of the relevant inquiry").

[52] *See Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 323 (1985) (observing that the court has never held "that the IRS must conduct its investigations in the least intrusive way possible[,] [i]nstead, the standard is one of relevance"); *SEC v. Arthur Young & Co.*, 584 F.2d at 1028-31 (holding that information subpoenaed may be obtained if reasonably relevant to an investigation within the authority of the agency); *see also See v. City of Seattle*, 387 U.S. 541, 544 (1967) ("[W]hen an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."); *Morton Salt*, 338 U.S. at 652-53 (finding that a government agency has not exceeded its investigatory power where "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant").

[53] *Powell*, 379 U.S. at 58 (internal citation omitted).

[54] *United States v. Stuart*, 489 U.S. 353, 360 (1989) (referring to the *Powell* factors as "the requirements of [agency] good faith"); *LaSalle Nat'l Bank*, 437 U.S. at 313, 318 (listing the *Powell* factors as the "elements of a good-faith exercise" and later referring to the factors as "the *Powell* standards of good faith").

bears the burden of rebutting the presumption of good faith.[55]  "This burden is a heavy one."[56]  To carry it, a respondent must point to "specific facts or circumstances plausibly raising an inference of bad faith."[57]

Federal courts applying *Powell*'s abuse of process standard have avoided rigid definitions of "bad faith."  Instead, they have restricted bad faith to those cases when an agency acts for reasons unrelated to the merits of the investigation.  Some examples include, when an agency serves a subpoena in support of a claim the agency "knows it cannot win,"[58] "fraud or deceit on the part of the government,"[59]

---

[55] *Stuart*, 489 U.S. at 360 (finding that affidavits submitted by the IRS "plainly satisfied the requirements of good faith [that the court] set forth in *Powell* and ha[s] repeatedly reaffirmed") (citing *Tiffany Fine Arts*, *Inc.*, 469 U.S. at 321); *United States v. Arthur Young & Co.*, 465 U.S. 805, 813 n.10 (1984)); *see also United States v. McCarthy*, 514 F.2d 368, 372 (3d Cir. 1975).

[56] *LaSalle Nat'l Bank*, 437 U.S. at 316; *see also United States v. Markwood*, 48 F.3d 969, 978 (6th Cir. 1995) ("*LaSalle* held that the party asserting the agency acted in bad faith bears a heavy burden of proof."); *United States v. Balanced Fin. Mgmt.*, *Inc.*, 769 F.2d 1440, 1444 (10th Cir. 1985) ("The burden then shifts to the taxpayers.  The burden is a heavy one."); *SEC v. Knopfler*, 658 F.2d 25, 26 (2d Cir. 1981) ("When the Commission has met the normal statutory prerequisites for enforcement, the opponent of a subpoena has a heavy burden if he seeks denial of enforcement on the ground that the subpoena is sought for an invalid purpose."); *N.L.R.B. v. Interstate Dress Carriers, Inc.*, 610 F.2d 99, 112 (3d Cir. 1979) ("[T]he burden on the party to whom the subpoena is addressed is not a meager one.").

[57] *United States v. Clarke*, 573 U.S. 248, 254 (2014) (holding that a taxpayer opposing an IRS summons on the grounds that it was issued for an improper purpose is entitled to examine IRS officials only if he alleges specific facts giving rise to an inference of agency bad faith); *SEC v. Marin*, 982 F.3d 1341, 1357 (11th Cir. 2020) (applying *Clarke*'s holding to other *Powell* criteria); *see also United States v. Garden State Nat'l Bank*, 607 F.2d 61, 71 (3d Cir. 1979) ("Allegations supporting a 'bad faith' defense are . . . insufficient if conclusionary.").

[58] *Wheeling-Pittsburg Steel Corp.*, 648 F.2d at 127 (internal quotation marks omitted).

[59] *Groder v. United States*, 816 F.2d 139, 144 (4th Cir. 1987) (quoting *United States v. Kaatz*, 705 F.2d 1237, 1243 (10th Cir. 1983)).

or where an administrative agency uses its civil investigatory powers solely for criminal investigations (where it is not already authorized to do so).[60]

### III.

We turn to three of the Department's related arguments on appeal—whether the Court of Chancery erred when it found that enforcing the subpoena would be an abuse of the court's process, even though the Department satisfied the *Powell* factors; whether Kelmar's contingent fee arrangement was relevant to the subpoena enforcement issue; and whether the court should have accepted representations that the subpoena's scope had been narrowed by the parties.

We agree with the Department on several points when it comes to the court's inquiry into an abuse of the court's process. First, it is correct that the proper scope of the subpoena and the reasonableness of the requested information is addressed under the second *Powell* factor—whether the information requested is relevant to the purpose of the investigation being conducted by the Department. We also agree with the Department that once the Court of Chancery found that the Department had satisfied the *Powell* factors, AT&T bore a heavy burden to rebut the presumption that the Department was acting in good faith in pursuing its investigation.[61] Further, we agree with the Department that there is nothing inherently wrong with the State's

---

[60] *LaSalle Nat'l Bank*, 437 U.S. at 318-19.
[61] *Id.* at 316; *Garden State Nat'l Bank*, 607 F.2d at 68.

designated representative, Kelmar, operating under a contingency fee arrangement and, when permitted, collaborating with other states on audits.[62] And finally, the Department is correct that parties should be able to narrow the breadth of a subpoena by representations made to the court without having to serve an amended subpoena.

We part company with the Department, however, when it comes to the court's authority to have the Department address its questions about the breadth of the subpoena and Kelmar's incentives. As recognized earlier, the Department enjoys a strong presumption of good faith. That strong presumption comes from satisfying the *Powell* factors. Yet even though the court's role is extremely constrained when deciding whether enforcing and administrative subpoena would be an abuse of the court's process, it still exists. When the court has questions about the appropriateness of a subpoena, it is within the court's discretion to inquire further, or to hold an evidentiary hearing to clear up disputed facts, before enforcing the subpoena.[63]

---

[62] A contingency fee arrangement with the auditor benefits the State because the State need not pay for audit services unless funds are uncovered that should be returned to the State. The State also does not have the expense of a large staff of state employee auditors to conduct compliance audits. The Department is also permitted by statute to enter into a contingency fee arrangement with designees (12 *Del. C.* § 1182(e)), who can coordinate its audits with other states. *Id.*

[63] *Garden State Nat'l Bank*, 607 F.2d at 71 (holding that when the government's "allegations are factually refuted by the [person opposing the subpoena], thus presenting a disputed factual issue, or where proper affirmative defenses, such as those alleging 'bad faith' . . . are factually supported[,] . . . the [person opposing the subpoena] is entitled to an evidentiary hearing") (citing *McCarthy*, 514 F.2d at 368); *United States v. Salter*, 432 F.2d 697, 700-01 (1st Cir. 1970) (setting a similar procedure for evidentiary hearings where the respondent has challenged enforcement of an administrative summons as an abuse of the court's process); *see also United States v. Church*

Here, the Department put the court in a box. It took the position that after the pleadings closed and briefing completed, the court had to decide the matter on the record submitted and issue a final appealable order either enforcing or quashing the subpoena.[64] In other words, the court's only options were to enforce the subpoena as is, or not at all. Either way, enter a final order. That is not what the *Powell* test contemplates. Instead, in a case when the court has doubts about the good faith of an agency's use of its subpoena power, the court can go beyond the written submissions and inquire further into whether the Department is using the administrative subpoena for purposes unrelated to the administrative investigation— for instance, to harass the respondent or further some other unrelated interest.

The Court of Chancery found the subpoena was "expansive, both as to the time period it covers and the subject matter it embraces."[65] According to the court, "[t]he Department seems to be pursuing information about property that it knows it cannot recover" or was in search of records "with last-known addresses outside of Delaware" for property "almost certainly non-escheatable" which would sweep up "a vast amount of irrelevant data."[66] The court was also concerned that Kelmar

---

*of Scientology of Cal.*, 520 F.2d 818, 824-25 (9th Cir. 1975) (citing with approval the procedure set forth in *McCarthy* and *Salter* and applying it to the case at hand).

[64] *AT&T Inc.*, 239 A.3d at 557 ("[T]he Department maintained that in an action to enforce an administrative subpoena, the only pleading is a complaint, the standard response is a motion to quash, and that based on that record, this court must make a decision that would result in a 'final appealable order' regarding the administrative subpoena.").

[65] *Id.* at 575.

[66] *Id.*

might be straying from its Delaware-based work into information that might help Kelmar recover unclaimed property for other states.[67]

Boxed in by the Department's black or white stance, the court was left in the unsatisfying position of having questions that the Department would not answer. As the court held:

> The Department might have good explanations on these points, but it eschewed the opportunity to provide them. The court is therefore left with the bare allegations of the complaint. Based on those allegations, the court is forced to conclude that enforcing the Subpoena as written would be an abuse of the court's process.[68]

In most cases the subpoena recipient will have a difficult time convincing the court to inquire further into an agency's good faith once the agency satisfies the *Powell* test. But under the circumstances of this case, where the court had serious questions but the Department refused to provide answers, the Court of Chancery did not err in quashing the subpoena in its entirety.

IV.

We now address the Department's argument that the Court of Chancery erred when it decided that the New Statute of Limitations did not apply retroactively and thus the Old Statute of Limitations applied to the Department's 2019 subpoena. The

---

[67] *Id.* at 576 ("The fact that Kelmar works for multiple states supplies a potential motivation for Kelmar's insistence on obtaining records for all checks and rebates, regardless of whether or not the last-known address on AT&T's records indicates that the property would have been escheatable to Delaware.").

[68] *Id.*

Court of Chancery used its statute of limitations analysis to review the reasonableness of the Department's document requests. Finding that the Old Statute of Limitations applied, the court used its shorter time frame as a measuring stick to assess the reasonableness of the Department's information demands.

Before the 2017 Amendments, the last update to the statute of limitations was 2002.[69] Under that version of the Escheat Law, the statute of limitations was tied to the holder's filing of an annual unclaimed property report. The State could not recover property until after it had issued a notice of deficiency for an annual report.[70] Generally, the State had three years from the holder's annual report filing to issue a notice of deficiency, and six years if the omission exceeded 25% of the amount disclosed in the report.[71] But if "no report [was] filed, or if a false or fraudulent report [was] filed with the intent to evade the obligation to pay over abandoned property," then the State could issue a notice of deficiency at any time.[72] Absent fraud, failure to issue a notice of deficiency within the statutory time period barred the State from suing to recover the unclaimed property.[73]

---

[69] 73 Del. Laws ch. 417 (2002).
[70] *Id.* ("The State Escheator, as soon as practicable *after* receipt of any report required by this chapter, shall examine it to determine if it is correct.") (emphasis added).
[71] *Id.*
[72] *Id.*
[73] *Id.* ("No suit to enforce the payment of a deficiency in payment of abandoned or unclaimed property shall be brought . . . against a holder unless the notice of deficiency in payment is mailed to the holder within the three (3) year period provided in this subsection.").

After the 2017 Amendments adopting the New Statute of Limitations, the State extended the limitations period to enforce unclaimed property laws to ten years after the duty arose to report the unclaimed property.[74] It also provided that the limitations period was tolled by delivery of a notice of examination or if the State Escheator "reasonably concludes that the holder has filed a report containing a fraudulent or willful misrepresentation."[75]

In its review of the reasonableness of the subpoena, the court noted first that "the statute of limitations [] does not operate as a bright-line rule that leads to a finding that a subpoena is unauthorized if the agency seeks records that are outside the limitations period."[76] Instead, when "an information request goes beyond the statute of limitations[,] [it] becomes part of the inquiry into whether it would represent an abuse of the court's process to enforce a subpoena . . . ."[77] The court found that neither the statute nor the legislative history showed that the General Assembly intended to apply the New Statute of Limitations retroactively.[78] Using

---

[74] 81 Del. Laws ch. 1 (2017); 12 *Del. C.* § 1156(b). Under the 2017 Amendments, the State is prohibited from "commenc[ing] an action or proceeding to enforce [the Escheat Statute] with respect to the reporting, payment, or delivery of property more than 10 years after the duty arose." *Id.*

[75] *Id.*

[76] *AT&T Inc.*, 239 F.3d at 569.

[77] *Id.* at 570. We note that the overbreadth of an administrative subpoena should not reflexively be treated as a trigger to inquire into whether the court's process is being abused. Overbreadth as part of a review for abuse of the court's process should be reserved for those rare cases when the scope of the administrative subpoena as a whole is so overbroad that it strongly supports an argument of bad faith by the agency.

[78] *Id.* at 568-69 (citing Del. S.B. 13 syn., 149th Gen. Assm. (2017)).

the Old Statute of Limitations, the court concluded that the Department's subpoena requests appeared unreasonable because they far exceeded the scope of what was permissible under the version of the Escheat Law in effect at that time.

On appeal, the Department advances three reasons why the Court of Chancery erred in applying the Old Statute of Limitations: (1) the New Statute of Limitations should be applied retroactively; (2) even if the Old Statute of Limitations applied, it should not be used to bar the State's review of records outside the limitations period, and (3) AT&T elected to be bound by the New Statute of Limitations when it entered the expedited examination program.[79]

For the first argument, the Department did not raise it before the Court of Chancery. In another case, the distinction might require serious consideration. In this appeal, however, it is waived.[80] For the second argument, we agree with the Department that *Powell* rejected a "bright line bar on the State's authority to conduct an investigation based on the running of the statute of limitations."[81] But the Court of Chancery recognized this point. As the court held when addressing AT&T's argument that the statute of limitations precluded the Department from requesting information outside the statute: "[f]ramed in this bright-line fashion, this argument

---

[79] Opening Br. at 28.

[80] Del. Supr. Ct. R. 8. AT&T raised the waiver issue in its answering brief. Answering Br. at 29. The Department did not respond to the argument in its reply brief.

[81] Opening Br. at 30 (citing *AT&T Inc.*, 239 F.3d at 569; *Powell*, 379 U.S. at 49; *EEOC v. Del. State Police*, 618 F. Supp. 451 (D. Del. 1985)).

does not provide grounds for quashing or modifying the Subpoena" and "AT&T's bright-line argument that the statute of limitations bars the Department from investigating those years runs contrary to precedent."[82] The court concluded that "[t]he statute of limitations ... thus does not operate as a bright-line rule that leads to a finding that a subpoena is unauthorized if the agency seeks records that are outside the limitations period."[83] The court did not apply a "bright-line" rule. Instead, it acknowledged the Department's ability to make information requests outside the limitations period, but assessed the reasonableness of the requests in relation to the ultimate investigatory purpose of the subpoena.

Finally, the Department contends that the New Statute of Limitations applies because AT&T elected to be bound by the 2017 Amendments based on its decision to participate in the expedited examination. Stated differently, AT&T should not benefit from the expedited examination program authorized by the 2017 Amendments without also being bound by the New Statute of Limitations, enacted under the same amendments.[84] The Department's position, however, is inconsistent with the position it took when the 2002 amendments to the Escheat Statute were adopted. As the Court of Chancery held:

---

[82] *AT&T Inc.*, 239 F.3d at 566, 569.
[83] *Id.* at 569.
[84] Opening Br. at 31 (citing *Harper v. United States.*, 2019 WL 4229755, *1 (S.D. Cal. Aug. 2, 2019); *Hampton v. Univ. of Md. at Baltimore*, 674 A.2d 145, 150 (Md. Spec. App. 1996)).

Then, the State Escheator agreed that "no statute of limitations applie[d] for periods for which reports were filed prior to July 22, 2002," and that the new statute of limitations applied for reports filed after the effective date.[85]

The Court of Chancery did not err when it considered the reasonableness of the subpoena in light of what it found to be the applicable statute of limitations.

V.

We affirm the Court of Chancery's judgment. We recognize, however, that the Court has announced new procedures and law governing enforcement of administrative subpoenas. Thus, although we affirm, the Department should have the opportunity to conform to the new procedures.[86] The Department should serve a new subpoena on AT&T consistent with this opinion. If the parties are unable to agree on production of the information called for in the amended subpoena, the

---

[85] *AT&T Inc.*, 239 A.3d at 569 (citing Ethan D. Millar et al., *Unclaimed Property*, Tax Portfolio Series (BNA) no. 1600-3d § 1600.05(J)(1), Bloomberg Law (database updated June 2020)).

[86] *See United States v. Cortese*, 614 F.2d 914, 918-19 (3d Cir. 1980) (remanding the case for further development of the record following the Third Circuit's articulation of the proper standard for showing bad faith); *White v. Panic*, 783 A2.d 543, 555 & n.45 (Del. 2001) ("We have implicitly recognized a narrow exception to this policy where the Court affirms the judgment of the Court of Chancery but announces a new rule of law or clarifies pleading standards that apply to the plaintiff's cause of action. In the interest of fairness, the Court directs the Court of Chancery in such cases to grant the plaintiff leave to amend the complaint in accordance with the newly announced rule or clarification."); *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 147 (Del. 1997) ("Because of the unique circumstances of this case, where we have been called upon to explicate pleading standards and the limited principles applicable to damages in a disclosure case, we remand for the sole purpose of allowing the plaintiff a reasonable opportunity to replead in a manner consistent with this opinion.").

Department should file an amended complaint and seek review by the Court of Chancery generally following the procedure set forth in *United States v. McCarthy*:[87]

1. The Department files a complaint to enforce an administrative subpoena (in this case an amended complaint). It must support the complaint with an affidavit or verification that shows it has a legitimate purpose for its investigation, the information sought may be relevant to the purpose and is not already in the Department's possession, and the Department has complied with any administrative requirements. The respondent then files a response and affidavits, where it supports any affirmative defenses and can contest the Department's assertions.

2. If the respondent goes a step further and claims that the subpoena has been issued for an improper purpose such that enforcement would be an abuse of the court's process, the burden is on the respondent to make a particularized showing in its response and by affidavit that the Department issued the subpoena in bad faith, meaning for reasons unrelated to the merits of the investigation.

3. After the respondent files a response and affidavits, the Court of Chancery can request further submissions to distill the issues for consideration. The court should convene a prompt hearing to address the enforcement issues

---

[87] 514 F.2d 368, 372-73 (3d Cir. 1975).

in summary fashion. An evidentiary hearing should take place only in those cases when the court, after according the great deference to the Department's administrative judgments, believes that the disputed issues can only be resolved after hearing from witnesses.